242 N.J. Super. 392 (1990)
576 A.2d 957
MIRELLA D'ATRIA, PLAINTIFF,
v.
JOHN D'ATRIA, DEFENDANT.
Superior Court of New Jersey, Chancery Division Family Part, Bergen County.
Decided March 28, 1990.
*394 Rita K. Nadler for plaintiff (Cole, Schotz, Bernstein, Meisel & Forman, attorneys).
Amy Baldwin Littman, for defendant (Kantrowitz & Goldhamer, attorneys).

OPINION
HARRIS, J.S.C.
PREFACE

"`Curiouser and curiouser!' cried Alice"

Lewis Carroll

INTRODUCTION
The post-judgment application before the Court involves 1) a return of an Order to Show Cause[1], 2) a joint application for reconsideration, and 3) three motions in aid of litigant's rights *395 pursuant to R. 1:10. The issues stem from the convoluted Dual Judgment of Divorce of July 20, 1989 and its incorporated Property Settlement Agreement. Reduced to their essences, the issues exist because of the perception by the parties of continued mutual betrayal, and the murky equitable distribution package arranged through their short-lived compromise. The issues are complicated because of an appeal in the Superior Court of New Jersey, Appellate Division, and proceedings in the United States Bankruptcy Court for the Southern District of New York.

PROCEDURAL POSTURE OF THE ACTION AND FINDINGS OF FACT

Visitation
On the eve of Christmas Eve, this Court signed an Order to Show Cause, together with a mandatory injunction, which set a visitation schedule for the parties and their two children for the Christmas holidays (Christmas Eve and Christmas Day[2]). Also incorporated in that Order to Show Cause was a provision permitting an application to modify the July 20, 1989 Judgment of Divorce to provide for a specific visitation schedule, rather than the ambiguous and undefined provision that:
"The husband shall have reasonable and liberal rights of visitation with the children.... In addition, the husband shall have the right of visitation with the children at such times as may be mutually agreed upon between the parties."[3]
The return date for consideration of a new plan for visitation was adjourned from time to time, until it finally was reached for initial disposition on February 16, 1990.

*396 Restrictive Covenant

The Property Settlement Agreement effectuated an unconventional distribution of assets, which required the transfer of some assets to the plaintiff from a corporate business entity (455 Realty Corp.) owned by the defendant. The defendant is also the owner of Showcase Tile, Inc., a retail and wholesale distributor of floor and wall tiles, which (either directly or through affiliates) operates a number of stores in the New York/New Jersey metropolitan area. The plaintiff belongs to a family that similarly (and competitively) operates a chain of ceramic and marble tile stores, the so-called Fuda Tile enterprise.[4]
The Property Settlement Agreement provided, in pertinent part, that defendant, in addition to transferring personal assets, agreed to transfer assets from, and to make agreements on behalf of, Showcase Tile, Inc. and its affiliates. The most significant agreement of this nature was defendant's[5] promise not to "operate a ceramic tile store within a seven mile geographical radius from any presently owned Fuda Tile location...."
On November 13, 1989, a "Revised Order to Show Cause" was signed by Judge Kahn which temporarily enjoined defendant (but not defendant's corporations) from, among other things, performing certain actions which were arguably contrary to the Property Settlement Agreement's restrictive covenant. Prior thereto, on November 2, 1989, Judge Kahn had enjoined not only defendant, but also Showcase Tile, Inc. from *397 any activities which were competitive with Fuda Tile.[6] The original Order to Show Cause was modified as to Showcase Tile, Inc. when it became apparent that the corporation was the subject of bankruptcy proceedings in the United States Bankruptcy Court for the Southern District of New York. Defendant has been named debtor-in-possession, and at present apparently continues to operate the Showcase Tile businesses.
Judge Kahn recused himself from further proceedings on the original and revised Orders to Show Cause (for reasons not here pertinent), and this Court was assigned to dispose of plaintiff's request for enforcement of the restrictive covenant as to defendant, individually. On January 19, 1990, this Court determined that 1) there were no genuine issues of material fact in dispute as to the distance (seven miles) from Showcase Tile's new Paramus store to the nearest operating Fuda Tile store and 2) the distance  a radius of seven miles  was to be measured in a straight line from store to store, and not by highway driving[7]. Based upon these findings, the Court entered an Order which permanently enjoined defendant from acting as an officer, director, or employee of any corporation which operates a ceramic tile store in violation of the Property Settlement Agreement. The Court tried to carefully segregate the roles of defendant which it was affecting. For example, no Order was entered which precluded defendant from acting in the capacity of debtor-in-possession under the direction and control of the Bankruptcy Court.
*398 On February 2, 1990, an appeal to the Superior Court of New Jersey, Appellate Division was filed by defendant from this permanent injunction. Also, an application was made in the Bankruptcy Court for relief from this Court's Order, but the request was withdrawn. At the present time, there are no Orders of the Bankruptcy Court affecting this Court's Order of January 19, 1990.
Notwithstanding the January 19, 1990 permanent injunction, the Showcase Tile store in Paramus was fitted up, and has opened for business. Although there is no direct evidence that defendant has, himself, been seen in the store acting in a management capacity, the only logical conclusion to be drawn from the fact that this outlet is now operating, is that defendant had a hand in effectuating such action. Any contrary argument would, at least, reveal defendant's abdication of his role as debtor-in-possession. At most, it suggests defendant's status as an employee and beyond.

First Motion in Aid of Litigant's Rights
On February 16, 1990, this Court was requested to not only consider the unfinished application regarding visitation (which had been pending since December, 1989), but a new enforcement initiative was made by plaintiff to try to enforce additional provisions of the Property Settlement Agreement, together with the following ancillary requests:
1. directing defendant to make support payments through the local probation department, (Cf. R. 5:7-4.;
2. directing defendant to provide transportation for all visitation transfers;
3. directing defendant to provide plaintiff with a telephone number when defendant has custody of the children during ordinary visitation.
The enforcement proceeding involved claims that defendant had failed to honor two provisions of the Property Settlement Agreement by which plaintiff is entitled to collect $80,000.00 and $17,500.00 from defendant.

*399 Second Motion in Aid of Litigant's Rights

When, in late January and early February, 1990, it became apparent to plaintiff that defendant appeared to be violating the January 19, 1990 Order of this Court, Plaintiff filed a motion to "impose monetary sanctions" upon the defendant, because of his alleged contumacious behavior. This motion was argued, for the first time, on March 16, 1990.

Defendant's Motion in Aid of Litigant's Rights
Not to be outdone by this parade of motions, defendant filed an application returnable on March 16, 1990 in aid of litigant's rights which sought an order:
1. compelling plaintiff to cease and desist from using the name "D'Atria" in any fashion; and
2. directing plaintiff to cease harassing and molesting defendant's new family by telephone, in person, or by mail.

Initial Determination
On February 16, 1990, the only issues before the Court involved visitation and the relief sought in the "First Motion in Aid of Litigant's Rights." The Court denied both applications, without prejudice, on the strength of R. 2:9-1(a)[8], which precludes a trial court from exercising jurisdiction (without appropriate instructions) while an appeal is pending. Notwithstanding that some of the relief sought by plaintiff's motion was claimed to be pursuant to R. 1:10 (which would have enabled the Court to act, even in the face of an appeal), and the visitation issues had germinated long before the February 2, 1990 appeal, the Court declined jurisdiction, and urged the *400 parties to seek the complete relief available in the Appellate Division by moving there for instructions[9].

Motion for Reconsideration
Instead of waiting for the Appellate Division's remand or order of instructions, defendant filed a conventional motion for reconsideration here. In a fleeting episode of agreement, both parties have joined in urging this Court to reconsider its declination of jurisdiction as to the February 16, 1990 issues. Thus, on March 16, 1990 the Court considered all of the issues presented, without prejudice to it again refusing to act until and unless the Appellate Division so authorizes. For the reasons which follow, the Court has reconsidered its original demurral, and as to those genuine applications to enforce litigant's rights (R. 1:10), disposition shall be afforded. As to those issues which are not truly within the umbrella of R. 1:10, the Court again shall defer decision until instructed to act by the Appellate Division.[10]

CONCLUSIONS OF LAW

Motion for Reconsideration
The initial determinations which must be made are the questions of reconsidering the Court's refusal to act on the visitation question, and the request for relief made in the "First Motion in Aid of Litigant's Rights."
*401 Neither party has presented any new facts which were not before the Court previously. Reconsideration is a matter within the sound discretion of the Court, to be exercised in the interest of justice. See Johnson v. Cyklop Strapping Corp., 220 N.J. Super. 250, 257, 263, 531 A.2d 1078 (App.Div. 1987); Cf. Michel v. Michel, 210 N.J. Super. 218, 509 A.2d 301 (Chanc.Div. 1985). A litigant should not seek reconsideration merely because of dissatisfaction with a decision of the Court. Rather, the preferred course to be followed when one is disappointed with a judicial determination is to seek relief by means of either a motion for leave to appeal or, if the Order is final, by a notice of appeal. Reconsideration should be utilized only for those cases which fall into that narrow corridor in which either 1) the Court has expressed its decision based upon a palpably incorrect or irrational basis, or 2) it is obvious that the Court either did not consider, or failed to appreciate the significance of probative, competent evidence. Said another way, a litigant must initially demonstrate that the Court acted in an arbitrary, capricious, or unreasonable manner, before the Court should engage in the actual reconsideration process. The arbitrary or capricious standard calls for a less searching inquiry than other formulas relating to the scope of review. Although it is an overstatement to say that a decision is not arbitrary, capricious, or unreasonable whenever a Court can review the reasons stated for the decision without a loud guffaw or involuntary gasp, it is not much of an overstatement. The arbitrary, capricious or unreasonable standard is the least demanding form of judicial review.
Alternatively, if a litigant wishes to bring new or additional information to the Court's attention which it could not have provided on the first application, the Court should, in the interest of justice (and in the exercise of sound discretion), consider the evidence. Nevertheless, motion practice must come to an end at some point, and if repetitive bites at the apple are allowed, the core will swiftly sour. Thus, the Court must *402 be sensitive and scrupulous in its analysis of the issues in a motion for reconsideration.
In this case, the Court is satisfied that it did not correctly analyze at least two of the issues previously presented. In retrospect, the applications to compel the payment of the $80,000.00 and $17,500.00 obligations by the defendant to the plaintiff, indeed, seek authentic Rule 1:10 relief. All the other relief requested is supplementary to the Judgment of Divorce, and not directly encompassed within it. The request to determine a particularized visitation schedule, the request to require support payments to be made through the Probation Department, the request to require a telephone number to be given by defendant to plaintiff during visitation, and the request to compel defendant to provide all transportation, derive their validity (or lack thereof) outside of the Judgment of Divorce. If the Court grants any of such relief, it will broaden the Judgment of Divorce. Therefore, such relief is not legitimately sought as the enforcement of the Judgment of Divorce.[11]
For those requests which do not fit neatly into R. 1:10, the Court believes that the appropriate course of action is to decline jurisdiction. Any doubts concerning the relief sought should be resolved in favor of deferral to the Appellate Division. Even if the issues are "collateral and supplemental to, and independent of, the subject matter of the appeal" (See Morrison v. Morrison, 93 N.J. Super. 96, 103-104, 225 A.2d 19 (Chanc.Div. 1966)), the trial court ought not intervene. The complete relief afforded by R. 2:9-1(a):

*403 "... The appellate court may at any time entertain a motion for directions to the court or courts or agencies below or to modify any order made by such courts or agencies or of any judge below.",
compels trial court deferral.
The $80,000.00 and $17,500.00 obligations, however, stand on different footing. In both instances, the claim is made that defendant's obligation to pay plaintiff is embedded in the Judgment of Divorce, has been actualized by post-judgment events, and no supplementation by the Court is necessary other than by a declaration that defendant has failed to abide by the Judgment of Divorce.

$80,000.00 Payment
Defendant claims that the Property Settlement Agreement requires the husband to "be responsible for the debt to National Community Bank in the amount of $80,000.00." The Property Settlement Agreement required that the $80,000.00 be paid from the proceeds of sale of certain property located in Union, New Jersey, which was scheduled to be sold shortly after the execution of the Property Settlement Agreement. The Property Settlement Agreement provides that in the event that the sale does not occur, the husband shall nevertheless be responsible for said debt and shall pay same from other assets available to him and shall indemnify and hold the wife harmless therefrom. It is uncontroverted that a transfer in ownership of the Union property has occurred, but that the $80,000.00 debt has not been paid by the husband. It is irrelevant as to the current status of this $80,000.00 debt or what property secured it. The simple fact of the matter is that the defendant personally promised to be responsible for this debt, he has not honored his promise, and the time for performance has come and gone. Plaintiff merely seeks to enforce that provision of the Judgment of Divorce which obligates defendant to come forward and do that which he agreed to do. As such, the Court finds and concludes that all of the conditions precedent to the payment and satisfaction of this $80,000.00 debt have been met, *404 and yet it has not been satisfied by defendant. Judgment shall be entered against defendant and in favor of plaintiff in the amount of $80,000.00.[12]

$17,500.00 Debt
The Property Settlement Agreement further provided that "The husband shall provide the wife with a demand (sic) note in the amount of $17,500.00 payable in six months of July 20, 1989." The purpose of this demand note (which obviously is merely a conventional time note since it is not payable on demand) was to evidence another personal obligation of defendant to pay plaintiff $17,500.00. Six months after July 20, 1989, is January 20, 1990. That date has come and gone, and the obligation to pay $17,500.00 has matured. The Property Settlement Agreement does not contemplate a requirement on the part of the plaintiff to sue the defendant on the Note in order to collect. Rather, the device of a Promissory Note was merely intended to evince the clear promise of defendant to pay a sum certain to plaintiff. The relief requested is to reduce this obligation to a judgment upon which execution is available (R. 4:59). Such relief is clearly within the four corners of the Property Settlement Agreement, and it shall be granted pursuant to R. 1:10-5. Accordingly, a Judgment in favor of plaintiff and against defendant in the amount of $17,500.00 shall be entered.

Visitation and Other Relief
The balance of the requested relief which was originally heard on February 16, 1990, as noted before, requires additional findings and conclusions outside the perimeter of the Property *405 Settlement Agreement. The Court will be called upon in each instance to either make specific fact findings and value judgments, or provide direction and guidance in the lives of these parties where they are incapable of managing themselves. This is not relief in aid of litigant's rights under R. 1:10. Said request is a new initiative for plenary judicial intervention.
Although R. 1:10 is ordinarily employed to obtain coercive measures to ensure compliance with a judgment or order, it is also available for limited declarations of rights of parties. It is a reservoir of power available to trial courts in the administrative sphere of controlling the disposition of their dockets. See Chalom v. Benesch, 234 N.J. Super. 248, 262, 560 A.2d 746 (Law Div. 1989). Although R. 1:10 spreads its influence far and wide, it may not be employed to the extent of making the declarations requested by the parties in the form of a visitation schedule, change of payment procedure, turnover of telephone number, and requiring defendant to shoulder all transportation arrangements for visitation. These postjudgment requests seek relief pursuant to R. 4:50. As such, these forms of relief are expressly within the ambit of the proceedings (see R. 2:9-1(a)) in the hands of the Appellate Division. This is not to say that these issues are necessarily for the Appellate Division to decide; indeed, that is not what the Court is suggesting. Rather, this Court ought not  in the interest of preserving appropriate comity and lines of authority between the Chancery Division, Family Part and the Appellate Division  meddle in the proceedings while it is on appeal, except as is minimally necessary and permitted (R. 1:10). Those limited exceptions under R. 2:9-1(a)  none of which are pertinent here  serve to provide a bright line over which this Court must not tread, without express guidance or instructions from the Appellate Division. Therefore, in the exercise of its discretion, and with due regard to the separation of functions between the trial court and the Appellate Division, the Court again defers, without prejudice, *406 consideration of these fictive R. 1:10 applications.[13]

Use of Surname and Injunction as to Harassment
Defendant has moved to compel compliance with the Property Settlement Agreement which seeks to enjoin plaintiff from using the surname D'Atria "in any fashion," and for a permanent injunction enjoining plaintiff from harassing and molesting defendant and defendant's wife by telephone, in person, or by mail. Plainly, the Property Settlement Agreement expressly limited plaintiff's right to use the surname D'Atria. However, the Property Settlement Agreement is quite clear and unambiguous that the surname D'Atria is forbidden for use by plaintiff only "in connection with any business activities." Furthermore, plaintiff agreed that she will use the name D'Atria only with respect to the children and their schooling. The issue which has been brought to the forefront, and which is not directly addressed by the language in the Property Settlement Agreement, is the use by plaintiff of the surname D'Atria in connection with certain mean-spirited correspondence written to defendant's new wife.[14] This immature, nonsensical, and silly posturing of plaintiff, while not necessarily violative of the express language of the Property Settlement Agreement, is so obnoxious and nasty so as to be clearly subsumed within the spirit of the Property Settlement Agreement. As such, this Court finds no difficulty whatsoever in treating defendant's request for relief as falling within R. 1:10 since defendant *407 merely seeks to enforce that to which the parties had already agreed. As such, a permanent injunction shall be entered in favor of defendant and against plaintiff precluding plaintiff, except when implicating any issues directly or indirectly affecting the children of the marriage, from using the surname D'Atria.
The supplemental relief requesting a permanent injunction to preclude plaintiff from "harassing and molesting" defendant and defendant's new wife shall be denied without prejudice since it is outside the Property Settlement Agreement and beyond the realm of R. 1:10, even though the grant of this request would be both fair and appropriate, given plaintiff's childish behavior.

Sanctions
The most difficult aspect of this case is to fashion a remedy for plaintiff because of the clear violation of this Court's January 19, 1990 Order. Defendant has manifestly participated in the establishment and operation of the Showcase Tile Paramus store. There is no question that this activity may be precluded within the ambit of R. 1:10. Indeed, the request for sanctions implicates a contempt proceeding under R. 1:10-2 and R. 1:10-4, although defendant disavows such interest.
The purpose of R. 1:10-5 is to provide a mechanism, coercive in nature, to afford relief to a litigant who has not received what a Court Order or Judgment entitles that litigant to receive. In this instance, plaintiff was entitled to the complete withdrawal and elimination of defendant from the operation of the Showcase Tile Store in Paramus. Although this Court may not intrude in the sphere of influence governed by the Bankruptcy Court, its jurisdiction over John D'Atria individually cannot be gainsaid. The Court is aware of the sensitive due process issues which are implicated by defendant's conduct. See Passaic Township Board of Education v. Education Association, 222 N.J. Super. 298, 536 A.2d 1276 (App.Div. 1987) and Board of Education v. Education Association, 235 N.J. Super. *408 417, 563 A.2d 55 (App.Div. 1989) which hold that monetary sanctions under R. 1:10-5 must (at least) be related to the litigant's damages and may not be primarily punitive in nature.
Rule 1:10-5 is designed to effectuate enforcement of a Court's Order. It is unlike a contempt proceeding, R. 1:10-1 through -4, where punishment is the objective. Nevertheless, a coercive incentive employed by the Court to compel compliance may be permissible, and even inflict punishment's sting. In this case, the opportunity for defendant to camouflage himself, chameleon-like, within the orbit of the Bankruptcy Court, makes a compliance package to be imposed by the Court rather difficult. Nevertheless, if the January 19, 1990 Order is to have any meaning, this Court must proceed vigorously and forthrightly, but with due regard to the zones of influence exercised by it and the Bankruptcy Court. For the purpose of effectuating the January 19, 1990 Order, the Court enters the following relief against defendant and in favor of plaintiff: The Court shall appoint an attorney to act as the custodial receiver/fiscal agent/special fiduciary[15] of the personal estate of defendant in so far as it relates to Showcase Tile, Inc., and its affiliates, and bearing upon the establishment and operation of the Showcase Tile Paramus store. The special fiduciary shall be entitled to seize and control all of the shares of stock of John D'Atria in Showcase Tile, Inc. or any of its affiliates which have *409 an interest in the management and operation of the Paramus store. The special fiduciary shall be entitled to take over in the place and stead of defendant as an officer and director in Showcase Tile, Inc. or any of its affiliates which are involved in the operation of the Paramus store. Finally, the special fiduciary shall, to the extent that it is capable of doing so in accordance with any necessary permission of the Bankruptcy Court, pay into a trust fund to be established by the special Fiduciary, any and all dividends, compensation, salary, travel expenses, and other sums that would be due and owing from Showcase Tile, Inc. or any of its affiliates to defendant, for work performed or profits derived at the Showcase Tile Paramus store. The special fiduciary shall be compensated at the rate of $200.00 per hour and shall be paid either by defendant, or out of the trust fund which the special fiduciary creates. The special fiduciary shall be permitted to make an application to the Bankruptcy Court in an attempt to be recognized by that Court as the special fiduciary for the personal estate of John D'Atria. Whether the Bankruptcy Court will recognize this status and whether it will make any difference to the Bankruptcy Court in determining defendant's status as debtor-in-possession, or in any other way, obviously will be left to that Court. It is not this Court's function (and it is not intended to be any display of arrogance or disrespect) to displace the Bankruptcy Court in the fair administration of the assets of the debtor before it. Nevertheless, the Courts of the United States ought not be misused by a litigant in a matrimonial action as a sword against the other spouse, without strict and scrupulous scrutiny to ensure no overbearing or unfair advantage. It is inconceivable that Congress intended that the Bankruptcy Code be used to such a purpose.
In the event that these measures fail to ensure compliance with this Court's January 19, 1990 Order, and plaintiff seeks additional or different measures or sanctions, the Court will seriously consider the appointment of a special prosecutor pursuant to R. 1:10-4 and the signing of an appropriate Order to *410 Show Cause to commence a contempt action. Contempt, being the defiance of government, will not be tolerated by this Court in any manner or form.

CONCLUSION
The arrogant disregard of the Property Settlement Agreement in this case has precipitated the torrent of motions. Without criticizing defendant's use of the Bankruptcy Court or the Appellate Division, the ultimate outcome here should result in a validation of substantially all of the agreed-upon provisions of the Property Settlement Agreement. As for those non-genuine R. 1:10 applications, the Court and the parties must await further instructions from the Appellate Division. Likewise, as to the bona fide applications under R. 1:10, the Court has acted on those requests and granted the appropriate relief. The knotty problems associated with granting apt relief under R. 1:10 make the Court's task trying. But that, of course, is the business of the Court, and the one from which it may not ultimately shrink. Plaintiff's counsel shall submit an appropriate form of Order, leaving a blank space for the Court to insert the name of the special fiduciary, in accordance with R. 4:42-1(b) and (c).
NOTES
[1] The matter was initially brought to the attention of the Court on an "emergent" application for a mandatory injunction under R. 4:52 which sought judicial relief to determine and fix the visitation rights of the parties for Christmas Eve and Christmas Day, 1989.
[2] The pathos of divorce is perhaps no better revealed than by the treatment of this singularly holy occasion as providing an extra holiday for purposes of visitation.
[3] Ironically, the Judgment of Divorce validated a joint custody design, with the children's primary residence with the mother. Given the nine month post-judgment period of rancor and acrimony, it might be appropriate to reconsider the joint custody arrangement. See Beck v. Beck, 86 N.J. 480, 498, 432 A.2d 63 (1981).
[4] The Property Settlement Agreement provided that defendant shall receive the stock and assets of Showcase Tile Holding Corp., Showcase Tile of New York Corp., Showcase Tile of Nanuet, and Marble Interiors Showcase. The defendant waived all claims against plaintiff's interest in Fuda Tile and its affiliates.
[5] Significantly, the Property Settlement Agreement was signed by the defendant solely in his individual capacity. It was not signed by a corporate officer on behalf of Showcase Tile, Inc. or any of its affiliates.
[6] The request for an injunction was precipitated by the ongoing establishment and ultimate operation of a Showcase Tile store in Paramus at a location within the area proscribed from competition by the Property Settlement Agreement.
[7] See Scutier v. Barile, 6 N.J. Super. 595, 597, 70 A.2d 894 (Chanc.Div. 1950): "If the area in a restrictive covenant is expressed by the use of the word "radius," the proscribed distance should be measured along a direct line. If the parties intend otherwise, it should be clearly expressed."
[8] R. 2:9-1(a) provides: "Except as otherwise provided by R. 2:9-3, 2:9-4 (bail), 2:9-5 (stay pending appeal), 2:9-7 and 3:21-10(d), the supervision and control of the proceedings on appeal or certification shall be in the appellate court from the time the appeal is taken or notice of petition for certification is filed. The trial court, however, shall have continuing jurisdiction to enforce judgments and orders pursuant to R. 1:10 and as otherwise provided...."
[9] Although moving papers in the Appellate Division have not been brought to the Court's attention, plaintiff's counsel advised that such a motion was, in fact, filed following the February 16, 1990 disposition. As of today, the Appellate Division has neither disposed of the motion, nor in any other way provided instructions to this Court.
[10] So that there is no misunderstanding, the Court has neither permanently refused to address the issues, nor attempted to pass the buck to the Appellate Division. Indeed, the Court stands ready, willing, and able to fully consider and decide all of the issues presented. The only obstacle is defendant's pending appeal.
[11] It may be argued that all matrimonial post-judgment relief, in essence, is made in the enforcement of the original disposition except, perhaps, for Lepis-type (83 N.J. 139, 416 A.2d 45 (1980)) modifications. It also may be said that matrimonial litigation is never truly concluded until one of the parties dies. If these be the guiding principles, then R. 2:9-1 would have no efficacy whatsoever in family part actions since the exception for R. 1:10 relief would swallow the general rule. That simply cannot be the intent of the Rule, and such a result is not followed here.
[12] The Property Settlement Agreement does not provide any other components to this debt other than "the amount of $80,000.00." For example, there is no mention of interest, costs or expenses, attorney or collection fees, or any other additur for which the defendant would be responsible.
[13] R. 2:9-1 might be a candidate for examination and revision in light of the myriad post-judgment applications that are commonplace in the Family Part. The opportunity for abuse and delay is apparent where multiple post-judgment motions are made and where, arguably, each post-judgment order entered is appealable as of right, since by definition each follows the initial judgment. As such, an appeal of a single-inconsequential post-judgment order could stymie and delay an important plenary hearing.
[14] The envelopes of this correspondence disclose that letters were written by plaintiff who identified herself in the upper left hand corner of the envelope reserved for the return address as "Mrs. John D'Atria # 2." The addressee, defendant's new wife, was identified as "Mrs. John D'Atria # 3."
[15] See Roach v. Margulies, 42 N.J. Super. 243, 246, 126 A.2d 45 (App.Div. 1956), citing Sears, Roebuck & Co. v. Camp, 124 N.J. Eq. 403, 411, 1 A.2d 425 (E. & A. 1938):

"Equitable remedies `are distinguished for their flexibility, their unlimited variety, their adaptability to circumstances, and the natural rules which govern their use. There is in fact no limit to their variety and application; the court of equity has the power of devising its remedy and shaping it so as to fit the changing circumstances of every case and the complex relations of all the parties.' 1 Pomeroy, Equity Jurisprudence, sec. 109 (5th ed. 1941). A lack of precedent, or mere novelty in incident, is no obstacle to the award of equitable relief, if the case presented is referable to an established head of equity jurisprudence  either of primary right or of remedy merely."