NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5104-14T3
                A-2956-15T3

IN THE MATTER OF BELLEVILLE
EDUCATION ASSOCIATION and BELLEVILLE
BOARD OF EDUCATION.

─────────────────────────────────────

BELLEVILLE EDUCATION ASSOCIATION,

    Plaintiff-Appellant,

v.

BELLEVILLE BOARD OF EDUCATION,

    Defendant-Respondent.

─────────────────────────────────────

**APPROVED FOR PUBLICATION**

**July 16, 2018**

**APPELLATE DIVISION**

Argued September 13, 2017 — Decided July 16, 2018

Before Judges Fuentes, Koblitz, and Suter.

On appeal from the Public Employment Relations Commission, Docket No. CO-2014-149, and Superior Court of New Jersey, Law Division, Essex County, Docket No. L-7237-15.

Stephen J. Edelstein argued the cause for appellant/cross-respondent Belleville Board of Education (in A-5104-14) (Schwartz Simon Edelstein & Celso, LLC, attorneys; Stephen J. Edelstein, of counsel and on the brief; Joshua I. Savitz and Aimee S. Weiner, on the brief).

Sanford R. Oxfeld argued the cause for appellant (in A-2956-15) (Oxfeld Cohen, PC, attorneys; Sanford R. Oxfeld, of counsel and on the brief; Samuel B. Wenocur, on the brief).

Sanford R. Oxfeld, argued the cause for respondent/cross-appellant Belleville Education Association (in A-5104-14) (Oxfeld Cohen, PC, attorneys; Sanford R. Oxfeld, of counsel and on the brief; Samuel B. Wenocur, on the brief).

Stephen J. Edelstein argued the cause for respondent (in A-2956-15) (Schwartz Simon Edelstein & Celso, LLC, attorneys; Stephen J. Edelstein, of counsel and on the brief; Joshua I. Savitz, Aimee S. Weiner and Vanessa E. Pena, on the brief).

Christine Lucarelli, Deputy General Counsel, argued the cause for amicus curiae New Jersey Public Employment Relations Commission (in A-2956-15) and respondent (in A-5104-14) (Robin T. McMahon, General Counsel, attorney; Christine Lucarelli, on the briefs).

The opinion of the court was delivered by

FUENTES, P.J.A.D.

This opinion involves two separate, but interrelated cases arising from the same core of operative facts. In the appeal filed by the local board of education under Docket Number A-5104-14, this court upholds the decision of the Public Employment Relations Commission (PERC) to assert its exclusive jurisdiction to decide complaints arising under the New Jersey Employer-Employee Relations Act (EERA), N.J.S.A. 34:13A-1 to -43, even when raised in the context of tenure charges. Applying the Supreme Court's holding in In re Local 195, IFPTE, 88 N.J. 393 (1982), this court also upholds the union's right to engage in good faith

negotiations to ascertain the impact the installation of exposed cameras with both audio and video capabilities would have on the terms and conditions of employment for the employees.

In the separate, but related appeal filed by the union under Docket Number A-2956-15, this court holds the Law Division does not have jurisdiction under Rule 4:67-6 to enforce an order entered by PERC. Adhering to the Supreme Court's holding in Galloway Twp. Bd. of Educ. v. Galloway Twp. Educ. Ass'n, 78 N.J. 25 (1978), we hold that only PERC may file a motion before the Appellate Division to enforce its own order under the EERA. A prevailing party in a PERC proceeding only has the right to request that PERC enforce its own order.

The simplest and most direct way to address the issues raised by the parties in these appeals is to proceed chronologically.

I

A-5104-14

On January 13, 2014, the Belleville Education Association (BEA) filed an unfair practice charge with PERC alleging that the Belleville Board of Education (Board) had violated the EERA. The BEA alleged the Board unilaterally implemented a policy that requires staff to wear radio frequency identification cards (RFID) and, in the guise of upgrading the security system in the schools, placed exposed cameras "with both video and audio capabilities"

in virtually all areas of the schools, leaving staff without a private space to congregate and express concerns to BEA officers. The BEA argued that these material alterations of the school environment affected their members' terms and conditions of employment and were therefore subject to good faith negotiation.

The BEA also alleged the Board retaliated against its President, Michael Mignone, by filing tenure charges against him when he openly advocated against these policies. The BEA claimed the Board's actions violated N.J.S.A. 34:13A-5.4(a)(1),(2),(3) and (5). The BEA sought interim injunctive relief prohibiting the Board from implementing the security measures and staying the prosecution of the tenure charges against Mignone.

The Board argued it had a non-negotiable managerial prerogative to unilaterally implement these security measures to protect the safety of the students and staff, especially in response to the recent surge of school shootings. The Board also stated the issues related to the retaliation charges were moot because it had withdrawn its complaint against Mignone. However, even if the charges were pending, the Board argued PERC did not have jurisdiction over this matter. In response, the BEA disputed that the charges against Mignone had been dismissed.

After considering the arguments of the parties, the Commission Designee denied the BEA's application for interim

injunctive relief. The Designee found that the surveillance/security system and RFID employee cards were a "more pervasive type of system, with newer technology, [that] has never been considered by the Commission." Under these circumstances, the Designee concluded that "[a]n interim relief proceeding is not the appropriate application for creating new law . . . ." With respect to the tenure charges against Mignone, the Designee rejected the Board's jurisdiction argument, holding that PERC "has [the] authority to decide whether the charges were brought against the individual for an inappropriate reason that may constitute a violation of the [EERA]." However, the Designee declined to grant any interim relief because there were material factual issues in dispute.

On May 16, 2014, PERC issued a Complaint and Notice of Prehearing. The parties thereafter presented their case to an arbitrator. On July 28, 2014, the arbitrator issued a decision in favor of the BEA and awarded remedies specifically tailored to the issues at hand. The arbitrator's comprehensive opinion found insufficient evidence to support the charges against Mignone, with one exception. The exception related to Charge II, Count 5 of the complaint, which alleged that Mignone inappropriately allowed a BEA representative to listen surreptitiously during a telephone conversation with a parent of a student.

The arbitrator found the evidence proved that Mignone "engaged in substantial misconduct by having an undisclosed BEA representative present during a conference call with the [p]arent of one of his students and the Guidance Counselor." The presence of the third party during this parent-teacher conference call "posed the potential violation of the privacy of the [p]arent and student despite the fact that nothing detrimental was revealed in the conversation."

The arbitrator dismissed the remaining charges and ordered a one-month suspension without pay as the appropriate penalty for the sustained charge. The arbitrator also ordered the Board to reinstate Mignone to his former position and "be made whole for the loss of compensation, if any, beyond the one-month suspension without pay imposed herein." By mutual agreement, both parties moved for summary judgment before PERC.

On June 25, 2015, PERC issued its written decision on the parties' summary judgment motions. With respect to whether the Board had the authority to install the audio-video surveillance system, PERC found:

> In the instant matter, the Board has installed exposed cameras with both audio and video capabilities in all classrooms, hallways, cafeterias, kitchens, gymnasiums, faculty lounges, most stairwells, some closets and other public spaces as well as the exterior of the buildings. Cameras are not installed

in restrooms, locker rooms and nurses'
offices. Audio recordings will only be
triggered in the event of an emergency or
security issue. Each classroom will also have
a telephone that will allow teachers to
quickly communicate with [School] District
officials and the police in the event of a
crisis. The Bellville Police Department will
have the ability to tap into the audio and
video feeds in the event of an emergency, but
will not be continuously monitoring the
[School] District.

. . . .

[T]he installation of exposed cameras for the
purpose of protecting people and property is
a significant government interest which places
the issue outside of the domain of
negotiability.

. . . .

The [School] District has a prerogative, and
responsibility, to take the measures it deems
appropriate to protect the safety of its
students and staff, particularly in light of
the numerous incidences of public violence in
our schools nationwide in recent past.

PERC reached a similar conclusion with respect to the RFID

employee identity cards:

[W]e consider the use of RFID cards as part
of the security system implemented by the
Board. The RFID cards can locate staff when
they are on school grounds or a school bus and
in proximity to a card reader. The [School]
District has determined that the use of these
cards is an important part of security for its
schools. The cards have a panic button
feature that could be critical in instantly
alerting the administration and police in the
event of a crisis. The [School] District's

7

interests in security in this area are substantial, in contrast to employees who cannot claim an interest in concealing their location during work hours, on school grounds and buses.

Despite these findings, PERC found the BEA had raised "many of the valid concerns" that favor the negotiability of these "impact issues." These issues include, but are not limited to: (1) the placement of cameras in the faculty lounges; (2) the designation of areas where cameras would not be installed to permit teachers to meet with BEA officers "to discuss sensitive or confidential matters;" (3) the establishment of notice protocols if data collected from RFID or audio-video recordings is used to support disciplinary charges, and procedures for accessing such data; (4) policies for retaining audio or video recordings and data collected from RFID cards; and (5) procedures for notifying staff if the Board planned to make significant changes to the cameras or the RFID cards.

In a footnote, PERC noted that the Board did not identify a particular need for monitoring areas where teachers and other staff congregate on school property. PERC acknowledged that the traditional teachers' lounge may be the only location in a school building where teachers are entitled to expect a measure of privacy:

> In a school setting, teachers generally do not have individual offices . . . [and] have no privacy in classrooms because they are engaged with students for the majority of the day, and also because classrooms are monitored by cameras. Faculty lounges should be areas where staff can go to during break to engage in conversations with colleagues about professional or personal matters without a concern of being monitored or overhead by a camera.

Finally, PERC found the arbitrator's decision to sustain certain tenure charges against BEA President Mignone, as well as the imposition of a one-month suspension without pay as a sanction, violated Mignone's rights under N.J.S.A. 34:13A-5.4(a) of the EERA. PERC also rejected the Board's argument challenging its jurisdiction to review this matter. Citing N.J.S.A. 34:13A-5.4(c), PERC held: "This agency has exclusive jurisdiction over unfair practice claims arising under the [EERA]."

PERC found that Mignone "engaged in protected activity" under EERA when he met with the Superintendent of Schools in September 2013 to "express his concerns about the security system" and when the BEA disseminated information disclosing the cost of the proposed surveillance system and encouraging BEA members to attend the Board meeting in October 2013.

PERC found the evidence showed the Board had "dual motives" for sending Mignone letters of reprimand, for suspending him, and for ultimately filing tenure charges against him. PERC also found:

> The record supports that Mignone engaged in misconduct when he participated in a conversation with his students about the security system and did not advise a mother of his student that [a BEA] representative was present listening in on their telephone call. However, the discipline that was imposed is notably disproportionate to the misconduct, particularly in light of Mignone's clean disciplinary record in his fourteen years of teaching in the [School] District prior to becoming [BEA] President.

PERC concluded that the punitive nature of the charges the Board filed against Mignone, coupled with the "timing" of these charges, are important factors in assessing the Board's motivation and "give rise to an inference that a personnel action was taken in retaliation for protected activity." PERC thus ordered the Board "to cease and desist from . . . [i]nterfering with, restraining or coercing employees in their exercise of the rights guaranteed to them by the [EERA] . . . ." PERC specifically cited the disciplinary actions the Board took against Mignone as an example of the type of retaliation prohibited by the EERA. PERC also restrained the Board from discriminating "in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage employees in the exercise of the rights guaranteed to by the [EERA] . . . ."

PERC also found the Board violated the EERA by "[r]efusing to negotiate in good faith with the [BEA], particularly with regard

to the severable impact on the staff from implementation of security cameras and use of RFID cards." PERC ordered the Board to apprise all staff of this decision by posting "in all places where notices to employees are customarily posted," a "Notice to Employees,"[1] attached as Appendix A to its June 25, 2015 final order and decision.

The Board appealed PERC's decision to this court on July 14, 2015. The matter came for oral argument on September 13, 2017. In response to our request during oral argument, counsel for the Board submitted a certification[2] in which he described the action and measures the School District has taken, as described by Dr. Richard D. Tomko, the Superintendent of Schools for the Bellville School District:

> 5. Dr. Tomko became the Superintendent in February 2015.
>
> 6. According to Dr. Tomko, at that time,[3] the District was in the process of removing those security cameras from District property that were not operational.

---

[1] We include a copy of PERC's "Notice to Employees" as an Appendix to this opinion.

[2] The certification contains eighteen numbered sections. We include here only those sections that are relevant to the issues related to PERC's decision and order.

[3] Because counsel's certification is dated September 18, 2017, we construe the phrase "at that time" to refer to the conditions that existed and the actions that were taken as of September 2017.

A-5104-14T3

7. Dr. Tomko advises that thereafter he continued to remove all cameras from classrooms and faculty spaces, excluding hallways, laboratories, gymnasiums, and auditoriums.

8. Dr. Tomko further advises that he notified the [BEA] of his actions in one or more of the regular weekly meetings which he holds with [BEA] leadership and worked with BEA President Micheal Mignone in determining whether any cameras remained.

9. Cameras which were disconnected, but still physically present in rooms, were then removed at the [BEA's] request.

10. As of some point in 2015, the exact date of which is unknown to Dr. Tomko, all cameras were removed from District Property.

. . . .

12. Dr. Tomko further advises that since his arrival in February 2015, there have not been any operational Radio Frequency Identification ("RFID") cards utilized within the District.

13. The District does not maintain the requisite server of software to operate the tracking feature of the RFID cards.

14. Although faculty members still have identification cards which may include RFID hardware inside the card, there is no software to monitor the hardware.

15. Moreover, the battery component of any such hardware, which was intact in approximately 2014, would have long expired at this time.

16. According to Dr. Tomko . . . the District did not circulate any documents or memoranda

A-5104-14T3

regarding the cameras or RFID cards since his arrival.

17. <u>None of the above was memorialized in any Board action</u>.

[(Emphasis added).]

The BEA did not respond to or otherwise refute the facts described in this certification.

II

PERC is an administrative agency designated by the Legislature to interpret, implement, and enforce the EERA. PERC's interpretation of the EERA is therefore entitled to substantial deference. <u>Commc'ns Workers of Am., Local 1034 v. N.J. State Policemen's Benev. Ass'n., Local 203</u>, 412 N.J. Super. 286, 291 (App. Div. 2010). The EERA guarantees employees "a vast array of rights, including the ability to appoint a majority representative to represent their interests and negotiate agreements on their behalf with an employer." <u>In re Cty. of Atl.</u>, 230 N.J. 237, 252 (2017) (citing N.J.S.A. 34:13A-5.3). It prohibits a public employer from "interfering with, restraining or coercing employees in the exercise of their rights" under the EERA, "[d]iscriminating in regard to . . . tenure of employment or any term or condition of employment to . . . discourage employees in the exercise of the rights guaranteed to them by this act[,]" and "[r]efusing to

13

negotiate in good faith" the terms and conditions of employment. N.J.S.A. 34:13A-5.4(a)(1), (2), (3), (5), and (7).

Here, PERC concluded that the Board's installation of exposed cameras, equipped with audio and video recording capability, for the purpose of protecting staff, students, and other people and property is a significant government interest which places the issue outside of the domain of negotiability. PERC reached the same conclusion with respect to the RFID employee identity cards. However, PERC also found that the BEA had raised many valid concerns that favored the negotiability of these "impact issues."

In the seminal case of Local 195, 88 N.J. at 403-05, our Supreme Court established the test for determining whether a subject is mandatorily negotiable between public employers and employees. The Court held that to be negotiable, "the subject matter must: (1) be an 'item [that] intimately and directly affects the work and welfare of public employees'; (2) be a topic that 'has not been fully or partially preempted by statute or regulation'; and (3) involve a matter where 'a negotiated agreement would not significantly interfere with the determination of governmental policy.'" Cty. of Atl., 230 N.J. at 253 (alteration in original) (quoting Local 195, 88 N.J. at 404-05).

Before we apply the Local 195 test to the issues at hand, we are bound to determine whether the Board's counsel's September

2017 certification attesting to the actions taken by the School District's Superintendent, Dr. Tomko, to abandon and remove the security camera surveillance initiative as well as the RFID staff identification badges, without formal approval by the Board, has any bearing of the continued legal viability of these issues. Stated more directly: are these issues now moot? Furthermore, even if these issues are now technically moot, we are entitled to assert our jurisdiction over them if they involve matters of substantial public importance and are capable of repetition. Brady v. Dep't of Pers., 149 N.J. 244, 253-254 (1997) (citing In re J.I.S. Indus. Serv. Co. Landfill, 110 N.J. 101, 104-05 (1988)).

We conclude these issues are not moot. The Board's counsel made clear in his certification that the Superintendent's actions have not been memorialized in a resolution formally approved by the Board. PERC's order directed the Board to engage in good faith negotiations with the BEA over the impact these measures would have on the terms and conditions of its members' employment. The Superintendent's unilateral actions to de facto abandon these surveillance projects do not constitute compliance with PERC's order.

PERC also ordered the Board to post the specific Notice to Employees that we have attached as an Appendix to this opinion. The Board's counsel's certification does not address this issue.

A-5104-14T3

Finally, the Board's legal challenge to PERC's jurisdiction to address and adjudicate the retaliation charge filed by the BEA's President was not within the scope of this court's request to the Board's counsel. Thus, it is not covered by the certification.

"The Legislature has vested PERC with 'the power and duty, upon the request of any public employer or majority representative, to make a determination as to whether a matter in dispute is within the scope of collective negotiations.'" City of Jersey City v. Jersey City Police Officers Benevolent Ass'n, 154 N.J. 555, 567-68 (1998) (quoting N.J.S.A. 34:13A-5.4(d)). "The standard of review of a PERC decision concerning the scope of negotiations is thoroughly settled. The administrative determination will stand unless it is clearly demonstrated to be arbitrary or capricious." Id. at 568 (citations and internal quotations omitted).

"Questions concerning whether subjects are mandatorily negotiable should be made on a case-by-case basis." Troy v. Rutgers, 168 N.J. 354, 383 (2001) (citing City of Jersey City, 154 N.J. at 574). The Supreme Court has established a three-part test for scope of negotiations determinations. Local 195, 88 N.J. at 403. A subject between public employers and employees is negotiable when:

> (1) the item intimately and directly affects the work and welfare of public employees; (2) the subject has not been fully or partially

> preempted by statute or regulation; and (3) a negotiated agreement would not significantly interfere with the determination of governmental policy. To decide whether a negotiated agreement would significantly interfere with the determination of governmental policy, it is necessary to balance the interests of the public employees and the public employer. When the dominant concern is the government's managerial prerogative to determine policy, a subject may not be included in collective negotiations even though it may intimately affect employees' working conditions.
>
> [Id. at 404-05.]

In our view, PERC's thoughtful decision properly applied the Local 195 test to strike a proper balance between the Board's managerial prerogative and obligation to ensure the safety of students and staff, and the BEA's right to advocate and negotiate for the interests of its members. The issues PERC addressed include, but are not limited to, good faith negotiations concerning the designation of zones of privacy where cameras would not be installed. A designation of a place like the traditional teachers' lounge would allow staff to discuss personal matters, including union issues, without fear of electronic eavesdropping by school administrators. The same principles of privacy and unwarranted intrusion would animate the negotiation involving the RFID staff identification badges.

17

As PERC noted, the BEA and the Board can negotiate the establishment of notice protocols if data collected from RFID badges are used to support disciplinary charges. This is but a small sampling of the universe of issues associated with this multifaceted security/tracking system. As the Court recently reaffirmed, through the enactment of the EERA, the Legislature "recognized that the unilateral imposition of working conditions is the antithesis of its goal that the terms and conditions of public employment be established through bilateral negotiation." Cty. of Atl., 230 N.J. at 252 (quoting Galloway Twp. Bd. of Educ. v. Galloway Twp. Educ. Ass'n, 78 N.J. 25, 48 (1978)).

## III

The Board argues that PERC lacks jurisdiction over the tenure charges it brought against Mignone. As PERC explained, the focus of the charge brought by the BEA was directed at the motivation for the Board's actions against Mignone. The BEA argued the tenure charges were pretextual, a ruse to conceal the Board's retaliatory motive to punish Mignone for engaging in protected conduct in the form of speaking out against the installation of the security system. PERC concluded it has "exclusive jurisdiction over unfair practice claims arising under [the EERA]" pursuant to N.J.S.A. 34:13A-5.4(c).

We agree with PERC. The EERA prohibits "[p]ublic employers, their representatives or agents" from:

> (1) Interfering with, restraining or coercing employees in the exercise of the rights guaranteed to them by this act.
>
> (2) Dominating or interfering with the formation, existence or administration of any employee organization.
>
> (3) Discriminating in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage employees in the exercise of the rights guaranteed to them by this act.
>
> [N.J.S.A. 34:13A-5.4(a).]

In adopting the EERA, the Legislature bestowed upon PERC the:

> exclusive power as hereinafter provided to prevent anyone from engaging in any unfair practice listed in [N.J.S.A. 34:13A-5.4(a) and (b)].
>
> Whenever it is charged that anyone has engaged or is engaging in any such unfair practice, the commission, or any designated agent thereof, shall have authority to issue and cause to be served upon such party a complaint stating the specific unfair practice charged and including a notice of hearing containing the date and place of hearing before the commission or any designated agent thereof . . . .
>
> [N.J.S.A. 34:13A-5.4(c) (emphasis added).]

The rules governing proceedings brought in the Office of Administrative Law (OAL) provide:

> As soon as circumstances meriting such action
> are discovered, an agency head, any party or
> the judge may move to consolidate a case which
> has been transmitted to the Office of
> Administrative Law with any other contested
> case involving common questions of fact or law
> between identical parties or between any party
> to the filed case and any other person, entity
> or agency.
>
> [N.J.A.C. 1:1-17.1(a).]

This procedural paradigm requires the Administrative Law Judge (ALJ) assigned to a case to "hear and rule upon the motion to consolidate." N.J.A.C. 1:1-17.1(c). Acceptance of the Board's argument would have required an ALJ to consolidate the tenure charges complaint filed by the Board against Mignone with the retaliation complaint Mignone filed against the Board under the EERA. However, Title 18A tenure charges are no longer referred to the OAL for hearing. The Legislature's enactment of TEACHNJ in August 2012 radically changed the disciplinary process for tenure teachers. As we explained in <u>Pugliese v. State-Operated School Dist. of City of Newark</u>, 440 N.J. Super. 501 (App. Div. 2015), under the Tenure Employees Hearing Law, N.J.S.A. 18A:6-10 to -18.1, the OAL no longer has any role to play in this process.

> Any charge against a tenured employee "shall
> be filed with the secretary of the board [of
> education] in writing, and a written statement
> of evidence under oath to support such a
> charge shall be presented . . . ." N.J.S.A.
> 18A:6-11. If "the board finds that such
> probable cause exists and that the charge, if

credited, is sufficient to warrant a dismissal . . . then it shall forward such written charge to the commissioner for a hearing pursuant to N.J.S.[A.] 18A:6-16, together with a certificate of such determination." Ibid.

Importantly, pursuant to the amendment contained in TEACHNJ, if the commissioner determines that the charge is sufficient to warrant dismissal, the case is referred to an arbitrator. N.J.S.A. 18A:6-16.

. . . .

"The arbitrator's determination shall be final and binding and may not be appealable to the commissioner or the State Board of Education. The determination shall be subject to judicial review and enforcement as provided pursuant to N.J.S.[A.] 2A:24-7 through N.J.S.[A.] 2A:24-10." N.J.S.A. 18A:6-17.1(e).

[Id. at 509-510 (emphasis added).]

Our Supreme Court has recently reaffirmed the basic principles of statutory construction:

[T]he starting point of all statutory interpretation must be the language used in the enactment. We construe the words of a statute in context with related provisions so as to give sense to the legislation as a whole.

If the plain language leads to a clear and unambiguous result, then our interpretative process is over. We rely on extrinsic evidence of legislative intent only when the statute is ambiguous, the plain language leads to a result inconsistent with any legitimate public policy objective, or it is at odds with a general statutory scheme.

> [*Spade v. Select Comfort Corp.*, 232 N.J. 504,
> 515 (2018) (emphasis added) (internal
> citations omitted).]

The plain text in N.J.S.A. 34:13A-5.4(c) confers upon PERC the <u>exclusive power</u> to adjudicate any claims asserted by a public employee alleging the public employer has engaged in any unfair practice listed in N.J.S.A. 34:13A-5.4(a). The EERA also expressly gives PERC "<u>the power and duty</u>" to determine whether a matter is within the scope of collective negotiations. N.J.S.A. 34:13A-5.4(d); <u>see also</u> <u>In re Judges of Passaic Cty.</u>, 100 N.J. 352, 363 (1985). These unambiguous proclamations of PERC's statutory authority by the Legislature leaves no room for doubt. PERC had the power and duty to adjudicate Mignone's claims of retaliation under N.J.S.A. 34:13A-5.4(a).

This court reviews final decisions of State administrative agencies pursuant to <u>Rule</u> 2:2-3(a)(2), mindful of the need to respect the action taken by such agencies pursuant to authority delegated by the Legislature. <u>In re Proposed Quest Acad. Charter Sch.</u>, 216 N.J. 370, 385 (2013). Thus, we may reverse an agency's decision only if its decision is arbitrary, capricious, or unreasonable, or the decision is inconsistent with the agency's mandate. <u>Ibid.</u> (citing <u>In re Petition for Rulemaking</u>, 117 N.J. 311, 325 (1989)). In going about this task, our role

22

is generally restricted to three inquiries: (1) whether the agency's action violates express or implied legislative policies, that is, did the agency follow the law; (2) whether the record contains substantial evidence to support the findings on which the agency based its action; and (3) whether in applying the legislative policies to the facts, the agency clearly erred in reaching a conclusion that could not reasonably have been made on a showing of the relevant factors.

[Id. at 386 (quoting Mazza v. Bd. of Trs., 143 N.J. 22, 25 (1995)).]

Applying these long-settled standards of review, we discern no legal basis to interfere with PERC's decision finding the Board's disciplinary action against Mignone was retaliatory and punitive in nature, and consequently violated the rights guaranteed to public employees under N.J.S.A. 34:13A-5.4. PERC was entitled to focus on the timing of the disciplinary charges against Mignone to infer the Board's retaliatory motive. PERC also found that under these circumstances, the Board's decision to file tenure charges against an employee with an unblemished thirteen-year record of service buttressed Mignone's claims of retaliation under the EERA. We thus affirm PERC's decision to set aside the arbitrator's decision to impose a one-month suspension without pay against Mignone.

We now address the BEA's appeal from the order entered by Judge Vicki A. Citrino on February 19, 2016, denying its motion to reconsider the judge's January 5, 2016 order dismissing its verified complaint and order to show cause (OTSC) filed against the Board pursuant to Rule 4:67-6, seeking enforcement of PERC's June 25, 2015 order. Inexplicably, the BEA opted not to appeal the January 5, 2016 order, which directly denied the BEA's enforcement action. Judge Citrino correctly noted the standard for granting a motion for reconsideration in her statement of reasons in support of her decision.

The decision to deny a motion for reconsideration falls "within the sound discretion of the [trial court], to be exercised in the interest of justice." Cummings v. Bahr, 295 N.J. Super. 374, 384 (App. Div. 1996) (quoting D'Atria v. D'Atria, 242 N.J. Super. 392, 401 (Ch. Div. 1990)). Reconsideration should only be used "for those cases which fall into that narrow corridor in which either (1) the [c]ourt has expressed its decision based upon a palpably incorrect or irrational basis, or (2) it is obvious that the [c]ourt either did not consider, or failed to appreciate the significance of probative, competent evidence." Ibid.

A-5104-14T3

Whether as a matter of appellate strategy or inadvertent oversight, the BEA's decision to limit the scope of this appeal to Judge Citrino's reconsideration decision also limits the scope of our review. As a threshold issue, the BEA has only provided us with the transcript of the oral argument session of the motion for reconsideration. The appellate record does not include the transcript that contains the January 5, 2016 decision denying the BEA's OTSC and dismissing its verified complaint.[4] Without this record, we cannot determine whether Judge Citrino's decision to deny reconsideration constituted a valid exercise of her discretionary authority.

However, given the great public importance of the issue before us, and recognizing that whether the Law Division has jurisdiction to enforce a final order of a State administrative agency is purely a question of law subject to de novo review, we have decided to address it. Rule 4:67-6(a) provides the following mechanism for the enforcement of final orders:

> Applicability of Rule. This rule is applicable to (1) all actions by a state administrative agency as defined by N.J.S.A. 52:14B-2(a) brought to enforce a written order or determination entered by it, whether final or interlocutory, and whether the order to be enforced requires the payment of money or

---

[4] In her January 5, 2016 order denying the BEA's enforcement pursuant to Rule 4:67-6, Judge Citrino wrote: "DENIED for the reasons set forth on the record."

imposes a non-monetary requirement or includes a combination of monetary and non-monetary remedies; and (2) all such enforcement actions brought by a party to the administrative proceeding in whose favor a written order or determination was entered affording that party specific relief.

[(Emphasis added).]

Rule 4:67-6(b)(1) provides:

Actions pursuant to paragraph (a) of this rule shall be brought in accordance with [Rule] 4:67 unless an applicable statute requires a plenary action in a specific matter. If the order sought to be enforced requires only the payment of money, it may be brought in the Superior Court, Law Division, or in any other court having statutory jurisdiction over the specific matter. If the order sought to be enforced provides in full or in part for a non-monetary remedy, the action shall be brought in a trial division of the Superior Court subject to motion pursuant to [Rule] 4:3-1(b) for transfer to the other trial division.

[(Emphasis added).]

However, in her statement of reasons for denying the BEA's motion for reconsideration, Judge Citrino noted that in enacting the EERA, the Legislature expressly authorized PERC to enforce its decision by making a direct application to the Appellate Division. Accordingly, N.J.S.A. 34:13A-5.4(f) provides:

The commission shall have the power to apply to the Appellate Division of the Superior Court for an appropriate order enforcing any order of the commission issued under subsection c. or d. hereof, and its findings

26

of fact, if based upon substantial evidence
on the record as a whole, shall not, in such
action, be set aside or modified; any order
for remedial or affirmative action, if
reasonably designed to effectuate the purposes
of this act, shall be affirmed and enforced
in such proceeding.

In light of this explicit grant of legislative authority, Judge Citrino concluded that the BEA had not met its burden of proving that her original decision was palpably incorrect. Cummings, 295 N.J. Super. at 384-85.

We start our analysis by noting that the BEA did not name PERC as a party. By leave granted, PERC is participating in this appeal in an amicus curie capacity. PERC acknowledges that the Legislature provided PERC with a mechanism to enforce its orders by applying to the Appellate Division under N.J.S.A. 34:13A-5.4(f). However, PERC argues that the process for seeking enforcement of its orders "changed in 1983 when [Rule 4:67-6] was adopted to provide a uniform procedure for the enforcement of orders issued by administrative agencies." Without citing any competent legal authority, PERC claims: "The rule effectively nullified the portion of N.J.S.A. 34:13A-5.4(f) providing that jurisdiction to enforce PERC's orders would reside in the Appellate Division . . . ."

What we find most troubling in PERC's legal position, however, is that it is based entirely on a 1984 unpublished opinion from

this court, which purportedly states that "the enforcement of agency orders has been allocated to the trial division of the Superior Court." By citing and relying on this unpublished opinion, PERC has violated an important principle of our jurisprudence:

> <u>No unpublished opinion shall constitute precedent or be binding upon any court</u>. Except for appellate opinions not approved for publication that have been reported in an authorized administrative law reporter, and except to the extent required by res judicata, collateral estoppel, the single controversy doctrine or any other similar principle of law, no unpublished opinion shall be cited by any court.
>
> [<u>Rule</u> 1:36-3 (emphasis added).]

As a unanimous Supreme recently stated: "This rule has been affirmed time and again by this Court." <u>Badiali v. N.J. Mfrs. Ins. Group</u>, 220 N.J. 544, 559 (2015); <u>see also</u> <u>Guido v. Duane Morris LLP</u>, 202 N.J. 79, 91 n. 4, (2010); <u>Mount Holly Twp. Bd. of Educ. v. Mount Holly Twp. Educ. Ass'n</u>, 199 N.J. 319, 332 n. 2 (2009); <u>In re Alleged Improper Practice</u>, 194 N.J. 314, 330 n.10 (2008).

Moreover, PERC's position in this respect is also directly undermined by our Supreme Court's forty-year-old decision in <u>Galloway Twp. Bd. of Educ</u>. As Justice Pashman wrote on behalf of the Court:

> In the event of noncompliance with its orders issued in unfair practice cases, PERC resumes

a prosecutorial role. PERC has been empowered to seek the aid of the courts in compelling compliance by applying to the Appellate Division for an appropriate judicial decree enforcing its order. N.J.S.A. 34:13A-5.4(f).

. . . .

The decision whether to initiate an enforcement action in a given case is entrusted to PERC's sound discretion. The statute authorizes, but does not require PERC to seek judicial assistance to enforce its orders. See also N.J.A.C. 19:14-10.2(b).[5] It is noteworthy that while the party found by PERC to have committed an unfair practice may seek appellate review of PERC's decision and order pursuant to R. 2:2-3(a), the successful charging party may only request PERC to seek judicial enforcement of its order. See N.J.A.C. 19:14-10.3.[6] The lack of any statutory authorization for the charging party to seek enforcement of PERC's

_____

[5] N.J.A.C. 19:14-10.2(b) provides: "The Commission may at any time in the exercise of its discretion institute proceedings for enforcement of its order pursuant to court rules."

[6] N.J.A.C. 19:14-10.3 provides, in pertinent part:

(a) Any party to the proceeding which resulted in the order for which compliance is sought may request that the Commission seek compliance with and enforcement of any Commission order.

(b) Such a request shall normally take the form of a motion addressed to the Chair and shall be accompanied by affidavits, as appropriate, setting forth the facts regarding the noncompliance of the party to whom the order was directed. An original and two copies of such request shall be filed with the Chairman, together with proof of service of a copy on all other parties.

> orders is consistent with the legislative
> design that PERC's role in enforcing the
> public rights created by the Act is exclusive.
>
> [Galloway Twp. Bd. of Educ., 78 N.J. at 34-35
> (emphasis added).]

In accordance with Galloway Twp. Bd. of Educ., we hold that the BEA did not have the legal authority to enforce PERC's order by filing a verified complaint and OTSC under Rule 4:67-6. Although PERC does not have the obligation to act, it has the exclusive authority to enforce its own orders and decisions pursuant to N.J.S.A. 34:13A-5.4(f). A prevailing party, such as the BEA, may request PERC to seek enforcement of its decision in the form of a motion addressed to the Chair. N.J.A.C. 19:14-10.3(b). The party to whom the order is directed, in this case the Board, may respond to the request within five days of service. See N.J.A.C. 19:14-10.3(c).

V

## Summary

In the appeal by the Board under Docket Number A-5104-14 challenging the decision and order entered by PERC on June 25, 2015, we affirm PERC's decision in all respects. In the appeal filed by the BEA under Docket Number A-2956-15, we affirm Judge Citrino's February 19, 2016 order denying the BEA's motion for reconsideration. We hold that PERC had jurisdiction, pursuant

to N.J.S.A. 34:13A-5.4(c), to determine whether the tenure charges the Board filed against the President of the BEA violated the EERA. We further hold that the Law Division does not have jurisdiction to enforce an order entered by PERC under the summary enforcement proceedings available in Rule 4:67-6.

Affirmed. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

 

# NOTICE TO EMPLOYEES
# PURSUANT TO
## AN ORDER OF THE
## PUBLIC EMPLOYMENT RELATIONS COMMISSION
## AND IN ORDER TO EFFECTUATE THE POLICIES OF THE
### NEW JERSEY EMPLOYER-EMPLOYEE RELATIONS ACT,
### AS AMENDED,

## We hereby notify our employees that:

WE WILL cease and desist interfering with, restraining or coercing employees in the exercise of the rights guaranteed to them by the Act, particularly by imposing discipline that was disproportionate to the misconduct of Michael Mignone in retaliation for him expressing the Association's concerns about: the security system and by failing to negotiate with the Association regarding the severable impact on the staff from the implementation of the security cameras and RFID cards.

WE WILL cease and desist from discriminating in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage employees in the exercise of the rights guaranteed to them by the Act, particularly by imposing discipline that was disproportionate to the misconduct of Mignone in retaliation for him expressing the Association's concerns about the security system.

WE WILL cease and desist from refusing to negotiate in good faith with the Association, particularly with regard to the severable impact on the staff from the implementation of security cameras and use of RFID cards.


Docket No.  <u>CO-2014-149</u>                          <u>BELLEVILLE BOARD OF EDUCATION</u>
                                                                      (Public Employer)

Date: _____          By: _____


This Notice must remain posted for 60 consecutive days from the date of posting, and must not be altered, defaced or covered by any other material.

If employees have any question concerning this Notice or compliance with its provisions. they may communicate directly with the Public Employment Relations Commission, 495 West State Street, PO Box 429, Trenton, NJ 08625-0429 (609) 984-7372

APPENDIX "A"

A-5104-14T3