**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3948-18

IN THE MATTER OF THE
ESTATE OF TODD HARRIS
APPLEBAUM, deceased.

_____

Argued January 26, 2021 – Decided April 22, 2021

Before Judges Gilson, Moynihan, and Gummer.

On appeal from the Superior Court of New Jersey, Chancery Division, Middlesex County, Docket No. 238799.

Santos A. Perez argued the cause for appellant Edita Applebaum.

Thomas S. Howard argued the cause for respondent William P. Fabian (Howard Law, LLP, attorneys; Thomas S. Howard and Andrew Bellwoar, on the brief).

Ronald L. Israel argued the cause for respondent Efraim (Frank) Rajs (Chiesa Shahinian & Giantomasi, PC, attorneys; Ronald L. Israel, on the brief).

PER CURIAM

Plaintiff Edita Applebaum appeals from numerous orders entered in connection with the administration of her deceased husband's estate

(Applebaum's estate or the Estate).   She challenges orders denying her applications (1) for temporary restraints and injunctive relief; (2) to remove the executor; (3) for an in-kind distribution to her of the stock held by the residuary Estate; (4) to compel a deposition; and (5) to recuse a judge.   Plaintiff also appeals from the final order approving the Estate's final accounting and, in connection with that argument, she contends that she was entitled to file counterclaims.

Having reviewed the extensive record developed during the more than six years of litigation concerning the Estate, we affirm all the orders except the April 30, 2019 order approving the final accounting.  We remand that one order with direction that the Chancery court conduct a limited evidentiary hearing to consider certain objections to the executor's final accounting.

I.

Todd Harris Applebaum (Applebaum) died testate on November 4, 2012. He was survived by plaintiff and their three children, including their adult son, Benjamin Applebaum (Ben).[1]  The primary assets of Applebaum's estate were a 100% interest in the Todd Harris Company, Inc. (THC), a 51% interest in Toben

---

[1]  To avoid confusion, we refer to Todd Harris Applebaum as "Applebaum," to Edita Applebaum as "plaintiff," and to Benjamin Applebaum as "Ben."  We mean no disrespect by using these names.

A-3948-18

Investments, Inc. (Toben), and a three-bedroom condominium in New Brunswick. The remaining 49% of Toben was owned by Ben.

THC, which employs approximately fifty-five people, operates a retail spa and pool store and has chemical, fitness, aquatic, and repair divisions that provide materials, equipment, and furnishings. Toben owned a commercial property in Linden.

Applebaum's will, which was executed on March 15, 2010, bequeathed 60% of the stock in THC to the "Trustees of the Todd Harris Co., Inc. Trust." Ben and defendants Frank Rajs and William P. Fabian were appointed as the trustees of the Todd Harris Co., Inc. Trust (Trust). Rajs was a close friend of Applebaum for more than fifty years and was a long-time employee of THC who managed the company's retail store. Fabian considered Applebaum to be "one of [his] best friends" and provided "consulting services and advice to THC and to [Applebaum] personally."

The will directed the trustees to manage the Trust for the benefit of plaintiff and Applebaum's living descendants and to disburse to them "or apply for [their] benefit . . . so much of the net income and principal of the Trust as my Trustee[s] shall from time to time deem advisable[.]" Upon plaintiff's death, the Trust's principal is to be distributed to Applebaum's three children and their

3

heirs per stirpes. The remainder of Applebaum's estate was bequeathed to plaintiff.

Applebaum appointed Fabian as the executor of his will. The will authorized the executor "without authorization of the [c]ourt, to sell, convey, mortgage, lease, invest, reinvest, exchange, manage, control, retain or otherwise deal with any and all property, real or personal, comprising [Applebaum's] estate, . . . and to make distribution under [the] Will wholly or partly in kind or money." On December 4, 2012, the Middlesex County Surrogate admitted Applebaum's will to probate and issued letters testamentary authorizing Fabian to administer the Estate.

At a special meeting of the THC shareholders on December 8, 2012, Fabian and Rajs were elected as the directors of the company on a motion made by plaintiff and seconded by Ben. Rajs was unanimously appointed as president and chief executive officer (CEO).

The next day, a special meeting of the directors of THC was attended by Fabian, Rajs, and Leah E. Capece, who, at the time, was the attorney for THC

4

and Applebaum's estate.[2] The directors agreed to increase Rajs' salary from $100,000 to $150,000, given his new role as president and CEO of the company.

At that meeting the directors also reviewed an employment agreement dated February 15, 2010, that Fabian and Applebaum executed, and that retained Fabian for ten years as a "Business Manager and Consultant" for THC at an annual salary of $104,000, paid weekly. The agreement provided that if Fabian's employment was terminated for any reason except the sale or liquidation of the business, amounts remaining due under the contract were payable immediately. If the business was sold or liquidated, Fabian was entitled to ten percent of either THC's gross sales price or liquidation value. Fabian started receiving his salary of $2,000 per week in November 2012, after Applebaum died.

Fabian represented that the salary "was effectively the only way he was being repaid for the loans and previous consulting fees he was owed by THC." He also claimed that he had made loans to THC in 1990 and 1993 totaling $150,000 with an interest rate of 8%, but there was no written agreement memorializing the loans. In addition, Fabian asserted that, at the time of Applebaum's death, he was owed $231,700 in unpaid consulting fees from THC.

---

[2] Fabian later retained Kirsch Gartenberg Howard LLP (Gartenberg Howard) to represent the Estate.

A-3948-18

Fabian explained that he and Applebaum "had expressly agreed that no repayment would commence until Fabian retired in 2013, at which time he would draw an annual salary and benefits, the value of which would be used to reduce the amount owed to [him]."

Capece opined that the agreement "appeared to be in full force and effect, and in all regards, legally enforceable." Rajs and Fabian agreed to continue and ratify Fabian's employment agreement.

In June 2013, Sun National Bank (Sun Bank) filed a complaint against THC, Applebaum's estate, Rajs, and Cecilia Keh, THC's controller. Sun Bank alleged that after Applebaum's death, Keh, with Rajs' knowledge, requested and received three separate drawdowns on a line of credit that Applebaum had established at Sun Bank. The line of credit was secured by THC's assets and personally guaranteed by Applebaum. According to Sun Bank, only Applebaum was authorized to request advances from the line of credit and his death was an event of default under the relevant agreements. Sun Bank alleged that the documents requesting the drawdowns contained Applebaum's forged signature.

Keh admitted that she had initiated the withdrawals on behalf of THC "because money was needed to continue to operate THC." In response to a question asking how the withdrawals came about, she replied that "[e]very year

6

during THC's slow time, [she] would draw down on the line of credit to be able to meet payroll and pay vendors. The line of credit would be paid off once business picked up again." She denied that Fabian, Rajs, or Laurence Gold, THC's accountant, had advised her to make the withdrawals but acknowledged that Rajs was aware of the drawdowns.

A special joint meeting of the boards of directors of THC and Toben was convened on June 27, 2013, attended by plaintiff, Rajs, Fabian, Ben, Gold, Capece, and Eileen Applebaum (Eileen), Applebaum's mother.[3] Capece explained that Sun Bank was demanding full payment of the loan, attorneys' fees, and the appointment of a receiver to liquidate the company. She opined that the chances of prevailing in the litigation were "extremely unlikely" and that the only way to resolve the litigation was to pay the bank. Sun Bank had agreed to dismiss the lawsuit if THC immediately remitted $348,132.89.

Fabian asked plaintiff if she had access to money to pay off the bank. Plaintiff stated that she had a home equity line of credit with $200,000 in available funds. Fabian then stated that Eileen had agreed to contribute $100,000 from the proceeds of Applebaum's life insurance policy when she

---

[3] This meeting was recorded and transcribed. The record also contains minutes from the meeting. The transcript identifies Eileen as present at the meeting, but the minutes do not.

received it in thirty to sixty days. He agreed to immediately loan THC the money owed to Sun Bank if plaintiff would put up her home equity line of credit.

Capece then asked whether the funds from Eileen were a gift or a loan. Fabian responded that they were a gift. He elaborated that:

> First of all, this is [Applebaum's] life insurance . . . proceeds.
>
> Secondly, Eileen was going to give it to the grandchildren. There's a whole lot of things. Eileen is going to get the check. She's going to sign the back of the check, hand it to me. I'm going to put it in my checking account and that's going to be the end of the day. We're not reporting anything to anybody at the end of the day. I don't know why I let you record this, but you better erase that part.
>
> You understand what I'm saying?
>
> That's what I'm going to do with Eileen, you know, so there's no record nowhere, but just so you know.

Plaintiff then admitted that she did not have an existing home equity line of credit but would apply for one. Fabian said he would lend the money pending the approval of her application but if she was unable to secure the funds, he was "going to take a mortgage against something." He then explained:

> [Y]ou know how [Applebaum] owes me all this money, right? If I put that on the corporate books, then Sun Bank would never have loaned us a dime or Wells Fargo. If I put that on the books now, Wells Fargo

won't make the loan. So I have to keep everything from me off the books, but if I drop dead, you know, I expect my family to be paid.

. . . .

In other words, I got to do the paperwork. And as long as I have your word that you'll take care of that, I'm good for that.

Okay?

Plaintiff responded affirmatively. She assured Fabian that "You will [get] your money. We will get the money."

Fabian then moved that the building owned by Toben, which was its sole asset and was then rented to a commercial laundry, be listed for sale at $899,000. Plaintiff objected to the sale, but Capece explained that the Estate needed cash to pay taxes and administrative expenses and that Fabian had the authority to make decisions regarding the Estate's assets. Ben seconded the motion, which passed unanimously. On October 22, 2013, the directors and shareholders of Toben voted unanimously to sell the property owned by Toben for $800,000 to North East Linen Supply, the property's then-tenant.

On June 27, 2013, a motion was also passed to sign a promissory note in exchange for Fabian's loan. The note, which was for $348,132.89, was executed effective that same day by Rajs on behalf of THC, Fabian as the lender, and

9

plaintiff and Ben as guarantors of the loan. The note contained a security provision, which stated in a handwritten notation that the debt was secured by a second lien on the Toben property and "A/R & assets on THC."

Following the June 27, 2013 meeting, plaintiff retained a lawyer and began to question various actions taken by Fabian and the other trustees. She also objected to how THC was being operated and sought a larger role in the management of the company. Plaintiff, who was a teacher, had been employed by THC on a part-time basis since January 2013, and began working there full time in June 2013. She was informed that her role at THC would not be expanded, and her objections were rejected.

Plaintiff also inquired about Applebaum's 401k plan and was told that it had been distributed to the Estate and used to pay the Estate's expenses because Applebaum had not listed a beneficiary for the 401k plan. She was advised to contact the company who managed the 401k plan to get copies of the paperwork for Applebaum's account.

On December 4, 2013, Rajs terminated plaintiff's employment at THC, citing as reasons that she was "[c]ausing general dissention and unrest among employees[,]" as well as disorderly conduct, insubordination, and job abandonment.

On March 31, 2014, plaintiff filed a verified complaint and an order to show cause (OTSC). In her eleven-count complaint, she named Fabian, Rajs, Gold, and Keh as defendants. She alleged that Fabian, Rajs, and Keh committed a tort against THC and breached their fiduciary duties by drawing down funds from the Sun Bank line of credit through forgery and fraud. She further alleged that because Fabian was a creditor of THC he had a conflict of interest in his roles as executor and trustee and that he breached his fiduciary duty by accepting $2,000 per week in salary to repay loans he made to the company. Plaintiff claimed that Rajs breached his fiduciary duty to her and THC by taking the $50,000 increase in salary. Fabian and Rajs also allegedly breached their fiduciary duties by mismanaging THC. Additionally, she asserted that Fabian had breached his fiduciary duty by voting to sell the Toben property. Finally, plaintiff alleged malicious or intentional interference with her inheritance and intentional infliction of emotional distress.

In her OTSC, plaintiff sought emergent relief, including, among other things to: (1) remove Fabian as executor of Applebaum's estate; (2) remove Fabian and Rajs as officers and directors of THC and Toben, and trustees of the Trust; (3) appoint plaintiff as executrix of Applebaum's estate, trustee of the Trust, and director of Toben; (4) compel Fabian to distribute 40% of THC's stock

11

to plaintiff and 60% of the stock to the Trust; and (5) compel Fabian to distribute 51% of Toben's stock to plaintiff.

Plaintiff also sought temporary restraints pending the return date of the OTSC: (1) restraining Fabian and Rajs from signing any contract to sell the Toben property or taking any actions on behalf of the Trust or as directors of THC; (2) restraining Fabian from taking any salary from THC or any money to repay himself from the Estate; (3) restraining Rajs from continuing to receive his $50,000 increase in salary; and (4) restraining Fabian, Rajs, and Keh from using money from THC, the Trust or the Estate to pay legal fees.

Hearings were held on plaintiff's applications for temporary restraints and preliminary injunctive relief. The Chancery court found that there was no showing of a likelihood of success on the merits or irreparable harm. Accordingly, the court denied the request for temporary restraints and preliminary injunctive relief.

Over the next five years, plaintiff filed a series of motions and emergent applications seeking, among other things, (1) to remove Fabian as executor; (2) to compel the distribution of 40% of THC's stock to her; and (3) to compel various discovery, including the deposition of Gold. The executor, on behalf of the Estate, also filed a complaint and OTSC to (1) approve the accountings of

12

the Estate; (2) approve the sale of 40% of the stock of THC to Ben, while the Estate retained the remaining 60% of stock pending a final accounting and distribution; and (3) authorize the sale of the condominium.

In their numerous submissions, the parties disputed many issues, including the value and management of THC, the sale of the Toben property, and the sale of the condominium. In various interim orders, the Chancery court denied plaintiff's motions and applications, finding that she had not established the grounds for the relief she sought. The court also permitted Fabian to remain executor and to manage the Estate.

The proceedings were complicated by plaintiff changing lawyers twice. Her lawyers filed repetitive and sometimes inconsistent motions and applications. Several issues kept coming up. Those issues included plaintiff's claim that Fabian and Rajs had engaged in fraud in connection with the Sun Bank line of credit and in applying for a line of credit from Wells Fargo Bank.

The parties also disputed the proper management of THC, with plaintiff contending that she should control the company, and Fabian and Rajs arguing that plaintiff lacked the experience and ability to manage the company. In support of their positions, Fabian and Rajs submitted affidavits from numerous THC employees and Applebaum's family members, including Ben and his

13

A-3948-18

nephew, niece, and mother. Those employees and relatives uniformly praised Rajs' management of the company. Many also attested to plaintiff's disruptive behavior while she was employed at THC. Applebaum's relatives explained that Rajs was a close and trusted family friend who had been with THC since its inception and had been transparent with the family since Applebaum's death. Ben pointed out that Fabian had demonstrated his loyalty to THC by lending money to Applebaum over the years and by mortgaging his own home to provide the funds THC needed to settle the Sun Bank lawsuit. Eileen certified that she acted as THC's treasurer for many years and she had personally seen large sums of money loaned by Fabian to Applebaum "for business purposes."

While the litigation was progressing, the Toben property and condominium were sold. The sale of the Toben property took place in April 2014, and the property was sold for $800,000. From the net proceeds, Toben paid Fabian $97,000, the balance THC owed on the $350,000 Fabian had lent to settle the Sun Bank matter. Toben also paid the Estate monies to repay loans made by Applebaum to Toben. In addition, Toben lent THC monies "to allow it to do necessary seasonal buying for the upcoming pool season." The condominium was sold for $515,000 in February 2017.

A-3948-18

In August 2017, Fabian filed the executor's final account for the Estate. Plaintiff opposed that accounting and various motions were filed concerning ongoing disputes.

In October 2018, Fabian filed a verified complaint seeking approval of the executor's final accounting for the Estate. The complaint also sought a judgment allowing payment of the commissions and fees incurred by the Estate. The executor's complaint asserted that the fair market value of the forty shares of THC stock, which represented a 40% interest in the company, was $273,000. The executor sought approval to sell Ben as many of those shares as Ben could afford at fair market value and to allow THC to redeem the remainder of the forty shares at a price of $6,825 per share. The value of the residual Estate proposed for distribution to plaintiff, subject to additional administrative expenses including attorney's fees, was $168,504.98.

The deputy surrogate issued an OTSC and set a return date of December 14, 2018. The OTSC required any party wishing to be heard with respect to the executor's complaint to file "a written answer, an answering affidavit, a motion returnable on the date that this matter is scheduled to be heard, or other response to [the OTSC]" by November 30, 2018.

A-3948-18

On November 30, 2018, plaintiff filed an answer to the executor's verified complaint to approve the final accounting. In her answer, plaintiff requested a plenary hearing. She also asserted that it was Applebaum's intent that 40% of THC's shares be distributed to her in-kind. She disputed the executor's valuation of the 40% interest in THC and alleged that the shares should be valued at $1.54 million. Plaintiff also denied that the executor was entitled to any commissions and she disputed the attorneys' fees and other professional fees the executor proposed to pay as part of the final accounting.

Plaintiff also filed a counterclaim, in which she alleged that Fabian had breached his fiduciary duty. She also objected to the fees and costs requested by the executor.

On December 10, 2018, plaintiff filed a motion seeking leave to amend her exceptions to the accounting and to compel the executor to provide various financial statements. She argued that she was unable to provide more detailed exceptions without deposing Gold and without receiving and reviewing THC's most recent financial statements.

On December 14, 2018, the court held a hearing on the OTSC to approve the final accounting. The court repeatedly asked plaintiff's counsel to identify specific numbers he was objecting to, but counsel never directly answered that

16

question; instead he made various arguments about fraud and mismanagement. Ultimately, the court found that plaintiff was not presenting any specific objections, except for the contention that the shares of THC should be transferred in-kind to plaintiff. The judge therefore reserved decision on the accounting and permitted the parties to submit briefs on the distribution of the THC shares.

In January 2019, plaintiff filed a motion to recuse the Chancery judge and stay all proceedings pending the deposition of Gold. In February 2019, the Chancery court heard argument on plaintiff's motions to file a counterclaim, to recuse the judge, and to stay proceedings pending Gold's deposition. The court denied all those applications.

The court explained that there was "no counterclaim in this kind of case" and plaintiff had already filed objections in her answer, although she had not taken specific exceptions to the accounting. Instead, she had raised a legal argument concerning the distribution of the THC shares. In addition, the court found that there was no basis for recusal. The court also denied plaintiff's request for a stay pending the deposition of Gold. Those rulings were memorialized in orders issued on February 27, 2019.

17

On April 30, 2019, the court filed a final order and statement of reasons approving the final accounting. The court found that there was no evidence in the record of fraud by the executor. The court also found that Applebaum's will specifically allowed for distributions to be made "wholly or partly in kind or money" and therefore the stock in THC could be sold. Specifically, the court ruled that the stock held by the residual Estate could be sold to Ben and any remaining shares could be purchased by the Trust and the purchase price paid to the residual Estate. The judge dismissed all claims against the executor, discharged the executor, and closed the Estate.

Plaintiff sought a stay of the final order pending appeal, but the Chancery court denied that application. We also denied plaintiff's application for permission to file an emergent motion for a stay, and the Supreme Court denied plaintiff's application for emergent relief.

II.

On appeal, plaintiff raises numerous arguments challenging both the final order entered on April 30, 2019, and nine interlocutory orders entered during the litigation. Plaintiff's arguments can be distilled into six primary contentions. She asserts that the Chancery court erred by (1) denying her applications for temporary restraints and injunctive relief; (2) denying her motions to remove the

18

executor; (3) approving the in-cash distribution of the THC shares to the residual Estate; (4) refusing to compel the deposition of Gold; (5) denying her recusal motion; and (6) failing to conduct an evidentiary hearing regarding her exceptions to the executor's final accounting.

Most of plaintiff's arguments lack support in the record and the law. In addition, it is not clear what relief plaintiff seeks in challenging the interlocutory orders. Some of those orders were entered years ago, and the subjects of those orders were addressed more fully in the final order. Indeed, we commend the Chancery court's patience in addressing repetitive and often inconsistent motions over the course of the six years of this litigation. We are constrained, however, to remand for a limited evidentiary hearing on plaintiff's objections to the executor's final accounting.

1.    The Denial of Temporary Restraints and Injunctive Relief

Plaintiff argues that the Chancery court erred when it refused to issue temporary restraints and denied a request for preliminary injunctive relief. Those rulings were made in April and May 2014. Plaintiff maintains that the court improperly applied an irreparable harm standard rather than a "clear and definite proof of fraud" standard. She asserts that the Sun Bank lawsuit and transcripts from the June 27 and August 29, 2013 meetings contain "clear and

A-3948-18

definite proof of fraud." She also contends that she was entitled to restraints to stop the sale of the Toben property. We disagree.

The standard for obtaining temporary or preliminary injunctive relief is well-established. Crowe v. De Gioia, 90 N.J. 126, 132 (1982). Such relief is an extraordinary remedy and should only be issued "when necessary to prevent irreparable harm." Ibid. The party seeking preliminary relief must demonstrate by clear and convincing evidence that (1) there is a reasonable probability of eventual success on the merits in accordance with settled law; (2) the moving party will suffer irreparable harm if restraints are not entered; and (3) comparing the "relative hardships to the parties reveals that greater harm would occur if [preliminary relief] is not granted than if it were." Garden State Equal. v. Dow, 216 N.J. 314, 320 (2013) (quoting McNeil v. Legis. Apportionment Comm'n, 176 N.J. 484, 486 (2003) (LaVecchia, J., dissenting)).

We review trial courts' decisions to grant or deny a preliminary injunction for an abuse of discretion. Rinaldo v. RLR Inv., LLC, 387 N.J. Super. 387, 395 (App. Div. 2006). Here, we discern no abuse of discretion.

The Chancery court applied the correct standard. The court properly did not accept plaintiff's contention that there had been a showing of "clear and definite proof of fraud." Instead, the court pointed out that plaintiff's

characterization of statements made at the board meetings were taken out of context and did not establish fraud by the executor.  Moreover, the court correctly noted that plaintiff had not made a showing of irreparable harm because she was complaining about potential money damages, which rarely satisfy the irreparable harm standard.  Crowe, 90 N.J. at 132-33 (noting "[h]arm is generally considered irreparable in equity if it cannot be redressed adequately by monetary damages"); Subcarrier Commc'ns, Inc. v. Day, 299 N.J. Super. 634, 638 (App. Div. 1997) (explaining irreparable harm means movant "must have no adequate remedy at law").

2.    The Requests to Remove the Executor

An executor may be removed if he or she "[e]mbezzles, wastes, or misapplies any part of the estate for which the fiduciary is responsible, or abuses the trust and confidence reposed in [him or her]."  N.J.S.A. 3B:14-21(c).  The power of removal, however, "should be granted only sparingly."  Wolosoff v. CSI Liquidating Tr., 205 N.J. Super. 349, 360 (App. Div. 1985).  "Where a decedent has chosen and designated persons to act as fiduciaries respecting his estate, . . . courts [should] act[] with reluctance to remove them from office."  Connelly v. Weisfeld, 142 N.J. Eq. 406, 411 (E. & A. 1948) (citation omitted).  Accordingly, "[c]ourts are reluctant to remove an executor or trustee without

21

clear and definite proof of fraud, gross carelessness, or indifference." In re Hazeltine's Est., 119 N.J. Eq. 308, 314 (Prerog. Ct. 1936); see also In re Margow's Est., 77 N.J. 316, 326 (1978) (noting courts are "hesitant to defeat the will of the testator," even where a chosen executor is flawed). "[S]o long as an executor or trustee acts in good faith, with ordinary discretion and within the scope of his [or her] powers, his [or her] acts cannot be successfully assailed." Connelly, 142 N.J. Eq. at 411. A Chancery court's decision regarding the removal of a fiduciary is reviewed for abuse of discretion. Wolosoff, 205 N.J. Super. at 360.

Plaintiff made multiple applications to remove Fabian as the executor of the Estate. She argued that Fabian had committed fraud because his loans to THC were not disclosed to Sun Bank or Wells Fargo. She also repeatedly referred to comments Fabian had made at the June 27, 2013 joint meeting of the directors of THC and Toben; specifically, that his loans to THC should not be disclosed on the company's books.

The record establishes that the line of credit from Sun Bank was obtained by Applebaum in 2010, two years before his death. Plaintiff offered no evidence that Fabian was involved in securing that line of credit. THC never received a

line of credit from Wells Fargo. Moreover, the application to Wells Fargo was pursued by Gold, not Fabian.

The deposition testimony of Kevin Harvey, a Wells Fargo principal relationship manager, and Debra Heins, a Sun Bank business relationship officer, provided no evidence of fraud by Fabian. Furthermore, the comments made by Fabian at the June 27, 2013 meeting were not direct evidence of fraud. The Chancery court repeatedly found that Fabian's comments concerning not reporting something were "taken out of context" and plaintiff's allegations were conjecture, rather than evidence of "fraud being committed by [Fabian], or upon anyone, least of all [plaintiff]."

Accordingly, we discern no abuse of discretion in the Chancery court's various orders denying plaintiff's requests to remove Fabian as the executor. We also discern no abuse of discretion in the order denying plaintiff's motion for reconsideration. At the hearing on the motion for reconsideration, plaintiff iterated the same arguments she had made at the initial hearing on her motion to remove the executor. A motion for reconsideration

> should only be used "for those cases which fall into that narrow corridor in which either (1) the [c]ourt has expressed its decision based upon a palpably incorrect or irrational basis, or (2) it is obvious that the [c]ourt either did not consider, or failed to appreciate the significance of probative, competent evidence."

23

[In re Belleville Educ. Ass'n, 455 N.J. Super. 387, 405 (App. Div. 2018) (alterations in original) (quoting Cummings v. Bahr, 295 N.J. Super. 374, 384 (App. Div. 1996)).]

Plaintiff did not show that the decision rested on an incorrect basis or that the court had failed to consider competent evidence.

3.    The In-Cash Distribution

Applebaum's will devised 60% of THC's stock to the Trust and appointed Fabian, Rajs, and Ben as trustees.  The will did not directly address the remaining 40% of the stock but devised the remainder of Applebaum's estate to plaintiff.  The will goes on to authorize the executor "without authorization of the [c]ourt, to sell, convey, mortgage, lease, invest, reinvest, exchange, manage, control, retain or otherwise deal with any and all property, real or personal, comprising [Applebaum's] estate, . . . and to make distribution under [the] Will wholly or partly in kind or money."

Plaintiff contends that the Chancery court erred in approving the in-cash distribution of the stock comprising the residual Estate.  She argues that the court order permitting the residual Estate's shares in THC to be sold is contrary to Applebaum's testamentary scheme and is inconsistent with our decision in In re Estate of Hope, 390 N.J. Super. 533 (App. Div. 2007).

A-3948-18

Distribution of assets from an estate are addressed in N.J.S.A. 3B:23-1 to -10. N.J.S.A. 3B:23-1 discusses the distribution of assets in-kind when a will does not authorize distributions to be made in cash or in-kind. In that regard, that section of the statute states: "Except where a will authorizes distribution[s] to be made in cash or in kind, the distributable assets . . . shall be distributed in kind to the extent reasonably possible through application of the following provisions[.]"

N.J.S.A. 3B:23-3 addresses the method of distribution and states:

> If the personal representative of either a testate or an intestate estate has, in the exercise of good faith and reasonable discretion, continued to hold in kind the distributable assets of an intestate estate or of the residue of a testate estate, the assets shall be distributed in kind if there is no objection to the proposed distribution and it is practicable to distribute undivided interests, otherwise those assets shall be converted into cash for distribution.

In Estate of Hope, we held that N.J.S.A. 3B:23-3 expressed a preference for in-kind distribution. 390 N.J. Super. at 540. Nevertheless, we also held that "the mode of distribution is subject to the equitable discretion of the personal representative of the estate, and ultimately, of the court." Ibid. We also recognized that "[a] trial court's rulings on discretionary decisions are entitled to deference and will not be reversed on appeal absent a showing of an abuse of

25

discretion involving a clear error in judgment." Id. at 541 (first citing State v. Marrero, 148 N.J. 469, 484 (1997); then citing State v. Kelly, 97 N.J. 178, 216 (1984); and then citing Harris v. Peridot Chem. (N.J.), Inc., 313 N.J. Super. 257, 283 (App. Div. 1998)).

Here, we discern no abuse of discretion concerning the in-cash distribution of the THC stock. First, Applebaum's will expressly authorized Fabian, as executor, "to make distribution[s] under [the] Will wholly or partly in kind or money." The will also expressly authorized the executor "to sell, convey, . . . manage, control, retain or otherwise deal with any and all property . . . comprising [Applebaum's] estate." Although that plain language does not indicate whether Applebaum preferred distributions in-kind or in cash, it clearly gave Fabian as executor the discretion to make that determination.

Second, even if the preference for in-kind distribution under N.J.S.A. 3B:23-3 was applied, both the executor and the Chancery court exercised their discretion regarding distribution of the stock in cash. See Est. of Hope, 390 N.J. Super. at 541 (recognizing personal representatives and equity judges may exercise discretion within the scope of their powers). The undisputed record establishes there were sound reasons for that determination.

No one disputes that THC had more value as an ongoing entity than if its assets were liquidated. The Chancery court found that there was no evidence that the trustees were improperly managing THC. Indeed, by the time that the final accounting was approved, Ben was the president of THC, and plaintiff has offered no evidence that Ben acted inappropriately.

This case is also distinguishable from the facts in Estate of Hope. There, the Chancery court ordered a sixteen-acre parcel of land to be sold and the proceeds distributed in cash to the four heirs. Id. at 536. On appeal, two of the heirs argued that N.J.S.A. 3B:23-1 and -3 required that the property be distributed in-kind. Id. at 537. We held that N.J.S.A. 3B:23-1 did not apply. Id. at 538. As already noted, we further held that although N.J.S.A. 3B:23-3 expressed a preference for in-kind distributions, an in-kind distribution may not be appropriate where a beneficiary with an interest in the asset objects. Id. at 540. We concluded that the executor and ultimately the court had the equitable discretion to distribute an asset in cash. Id. at 541. Accordingly, our reasoning and holdings in Estate of Hope support an affirmance of the Chancery court's ruling in this case. See ibid.

A-3948-18

4.     The Request to Depose Gold

Plaintiff's arguments concerning her request to depose Gold lack sufficient merit to warrant extensive discussion in a written opinion. See R. 2:11-3(e)(1)(E). Accordingly, we make only a few brief comments.

The record reflects that plaintiff had the opportunity to depose Gold for several years but for some reason the deposition never took place. On November 30, 2018, more than a month after Fabian filed the verified complaint seeking approval of the final accounting, plaintiff filed a motion to extend discovery and compel Gold's deposition. On January 3, 2019, after the return date for approval of the final accounting, plaintiff sought to stay the proceedings so that she could depose Gold. By that time, Gold was not the accountant for the Estate and was only the accountant for THC. More critically, the Chancery court determined that there was no good cause for delaying this matter further. We discern no abuse of discretion in that decision. See Rivers v. LSC P'ship, 378 N.J. Super. 68, 80 (App. Div. 2005) (explaining that we review rulings on discovery matters for abuse of discretion).

5.     The Motion to Recuse the Judge

In January 2019, plaintiff moved to recuse the Chancery judge who was then handling the matter. She claimed that the judge showed "clear bias in

28                                                                   A-3948-18

granting the executor's every request, while denying everything sought by plaintiff." She also asserted that the judge "ab initio 'exonerated' the executor for fraud . . . while characterizing plaintiff's proofs in a scandalous manner[.]" In addition, she faulted the judge for imposing the "death penalty" remedy of disinheriting her because of his rulings concerning the Estate.

The grounds for disqualifying a judge are set out in Rule 1:12-1. Primarily, they focus on the judge having a familiar relationship with the parties or the attorneys or having an interest in the subject of the litigation. R. 1:12-1(a) to (f). The rule also provides that a judge can be disqualified "when there is any other reason which might preclude a fair and unbiased hearing and judgment, or which might reasonably lead counsel or the parties to believe so." R. 1:12-1(g).

Under Rule 1:12-1(g), "it is not necessary to prove actual prejudice on the part of the court[;]" rather, "the mere appearance of bias may require disqualification." State v. Marshall, 148 N.J. 89, 279 (1997). "However, before the [judge] may be disqualified on the ground of an appearance of bias, the belief that the proceedings were unfair must be objectively reasonable." Ibid. "[B]ias is not established by the fact that a litigant is disappointed in a court's ruling on an issue." Id. at 186.

"Motions for disqualification must be made directly to the judge presiding over the case." State v. McCabe, 201 N.J. 34, 45 (2010); R. 1:12-2. "They are entrusted to the sound discretion of the judge and are subject to review for abuse of discretion." McCabe, 201 N.J. at 45 (citing Panitch v. Panitch, 339 N.J. Super. 63, 66 (App. Div. 2001)). Here, we discern no abuse of discretion.

Plaintiff offered no proof that the judge was biased against her. Instead, she complained that the judge never agreed with her. Dissatisfaction with a judge's rulings does not warrant recusal. Marshall, 148 N.J. at 186. Indeed, if plaintiff were to apply that standard, she would be seeking to recuse all the judges who sat on the case concerning her husband's estate. More pointedly, our careful review of the record discloses no grounds that would warrant the recusal of the judge.

6.     The Final Accounting

"Actions to settle the accounts of executors . . . [are] commenced by the filing of a complaint in the Superior Court, Chancery Division, and upon issuance of an order to show cause pursuant to [Rule] 4:83." R. 4:87-1(a). The action proceeds as a summary matter, R. 4:83-1, conducted in accordance with Rule 4:67-5, see N.J.S.A. 3B:2-4 (allowing actions by fiduciaries to proceed in a summary manner); see also Garruto v. Cannici, 397 N.J. Super. 231, 240-41

(App. Div. 2007) (providing an overview of probate proceedings in New Jersey). "[A] court must make findings of facts, either by adopting the uncontested facts in the pleadings after concluding that there are no genuine issues of fact in dispute, or by conducting an evidentiary hearing."  Courier News v. Hunterdon Cnty. Prosecutor's Off., 358 N.J. Super. 373, 378-79 (App. Div. 2003).  If there are genuine issues as to any material fact, the court should conduct an evidentiary hearing on those disputed issues.  Tractenberg v. Twp. of W. Orange, 416 N.J. Super. 354, 365 (App. Div. 2010) (citing R. 4:67-5); Courier News, 358 N.J. Super. at 378.  Accordingly, "at any stage of the action, the court for good cause shown may order the action to proceed as in a plenary action[.]"  R. 4:67-5.  The decision to approve the final accounting is reviewed for an abuse of discretion.  In re Koretzky's Est., 8 N.J. 506, 535 (1951).

Rule 4:87-8 governs exceptions to final accountings and allows an interested person to file written exceptions.  Specifically, the rule states:

> In all actions for the settlement of accounts, other than plenary actions, any interested person may, at least [five] days before the return of the order to show cause or within such time as the court allows, serve the accountant with written exceptions, signed by that person or his or her attorney, to any item in or omission from the account, including any exceptions to the commissions or attorney's fees requested.  The exceptions shall state particularly the item or omission excepted to, the modification sought in the account and

A-3948-18

the reasons for the modification.  An exception may be stricken because of its insufficiency in law.

[Ibid.]

Exceptions to an executor's account are "a vehicle for determining the propriety of the executor's statement of assets and claims for allowance."  Perry v. Tuzzio, 288 N.J. Super. 223, 229 (App. Div. 1996).  Our Supreme Court has described an action to settle an account as "a formalistic proceeding" that "involves a line-by-line review [of] the exceptions to an accounting."  Higgins v. Thurber, 205 N.J. 227, 229 (2011) (citing R. 4:87-1(a)).  Although persons making an objection may file an answer, no counterclaim or crossclaim can be filed without leave of court.  R. 4:67-4(a).

The rule regarding exceptions does not specify how the exceptions must be presented, except that they must be written, signed by the person making the exceptions or his or her attorney, and must identify "the item or omission excepted to, the modification sought in the account[ing,] and the reasons for the modification."  R. 4:87-8.  Plaintiff filed an answer, as permitted by the OTSC and Rule 4:67-4(a).  In her answer, she requested a plenary hearing.  She disputed the Estate's accountant's valuation of THC, denied the executor was entitled to commissions, and disputed the allowance claimed by the executor for

attorneys' and accountants' fees. As required by Rule 4:87-8, plaintiff also provided reasons for the modifications she sought.

Our review of plaintiff's answer satisfies us that her exceptions were sufficient, and she raised several issues that warranted an evidentiary hearing before the court could approve the final accounting. Accordingly, we remand for a limited hearing. In doing so, we clarify the scope of that limited hearing. First, plaintiff will be limited to the exceptions she identified in her answer filed on November 30, 2018. We discern no abuse of discretion in the Chancery court's determination that plaintiff did not present viable counterclaims. We also discern no abuse in the Chancery court's decision to deny plaintiff's request to amend her answer and counterclaims.

Second, certain issues raised in her answer have already been resolved. Plaintiff seeks to object to the sale of the Toben property, but that issue has already been ruled on and cannot be raised again at the evidentiary hearing. Similarly, we have already affirmed the Chancery court's ruling on the in-cash distribution of the value of the stock in THC, and that issue cannot be raised at the evidentiary hearing.

Third, plaintiff is not entitled to any further discovery. Plaintiff had more than five years to conduct discovery and we discern no abuse of discretion in the Chancery court's decision to end discovery.

Finally, we point out that the Chancery court will have the discretion to limit the evidentiary hearing to genuine, material disputes concerning the accounting. Perry, 288 N.J. Super. at 229. We make this final point because a review of the record establishes that plaintiff's various lawyers have often made allegations of fraud and misconduct while failing to identify specific facts supporting those claims. The brief submitted by plaintiff on this appeal illustrates that point. Plaintiff's counsel repeatedly used words such as "brazenly," "clearly spurious," "draconian," "inhumane," "rampant," "Orwellian," "pernicious," "nefarious," "mind-boggling," and "death penalty." Those hyperboles are a poor substitute for reasoned analysis of the facts and law. Accordingly, although we are constrained to remand this matter for an evidentiary hearing, the Chancery court will have the appropriate discretion to conduct a hearing that is focused on the presentation of facts supported by evidence and facts that are limited to appropriate exceptions to the final accounting.

## III.

In summary, we affirm all the orders plaintiff appealed except the April 30, 2019 order approving the final accounting. We remand for a limited and focused evidentiary hearing on disputed material issues identified in plaintiff's November 30, 2018 answer.

Affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3948-18