# **RECORD IMPOUNDED**

### **NOT FOR PUBLICATION WITHOUT THE APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1425-20

N.G.,

       Plaintiff-Respondent/
Cross-Appellant,

v.

R.T.,

       Defendant-Appellant/
Cross-Respondent.

_____

       Argued January 10, 2022 – Decided February 28, 2022

       Before Judges Sabatino and Natali.

       On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Middlesex County, Docket No. FV-12-0291-21.

       Joshua D. Altman argued the cause for appellant/cross-respondent (Benedict and Altman, attorneys; Joshua D. Altman, on the briefs).

       Benjamin J. DiLorenzo argued the cause for respondent/cross-appellant (Bressler, Amery & Ross, PC, attorneys; Diana C. Manning, Benjamin J. DiLorenzo, and Kyle A. Valente, on the briefs).

PER CURIAM

Defendant R.T.[1] appeals from a December 4, 2020 final restraining order (FRO) and a January 27, 2021 amended FRO, which memorialized the denial of his motion for reconsideration and to reopen the hearing, entered pursuant to the Prevention of Domestic Violence Act (PDVA), N.J.S.A. 2C:25-17 to -35. Plaintiff N.G. cross-appeals. We affirm.

I.

In 2015, plaintiff began her employment as a discovery clerk in the Middlesex County Prosecutor's Office located on the first floor of 25 Kirkpatrick Street in New Brunswick, which is located next to the Municipal Court.[2] While at work, plaintiff met defendant, who was then a lieutenant with the New Brunswick Police Department located on the second floor of 25 Kirkpatrick Street. The parties engaged in a brief dating relationship, which ended in 2016.

On July 30, 2020, plaintiff filed a Domestic Violence Civil Complaint against defendant alleging predicate acts of stalking and harassment and

_____

[1] We use initials where appropriate to protect the victim's privacy. R. 1:38-3(c)(12).

[2] The record contains various references to plaintiff working in the Municipal Court as opposed to the Middlesex County Prosecutor's Office. Plaintiff, however, clearly testified she was employed by the Middlesex County Prosecutor's Office during the relevant period.

A-1425-20

obtained a temporary restraining order (TRO). With respect to the alleged predicate acts, the complaint described that a local newspaper, <u>New Brunswick Today</u>, published an article on June 22, 2020 about defendant harassing an unnamed woman, who plaintiff believed to be her. Afterwards, the reporter received an email from someone who knew both plaintiff and defendant and which contained allegations against plaintiff and personal information only defendant knew, which the reporter provided to plaintiff. Plaintiff's complaint also alleged prior acts of domestic violence including incidents when defendant repeatedly texted and called her, sent her a picture of his genitals, drove by and sent a police officer to her house, and grabbed her and refused to let go.

In support of her complaint, plaintiff testified before a hearing officer. In relevant part, plaintiff described that she spoke to her employer about defendant's harassment in March 2020, resulting in investigations by the Middlesex County Prosecutor's Office and the New Brunswick Police Department. She stated, however, that the Prosecutor's Office concluded there was insufficient evidence to charge defendant criminally, and the Police Department determined there was insufficient evidence to "prove or disprove sexual harassment in the workplace."

3

The resulting July 30, 2020 TRO barred defendant from plaintiff's residence and "place of employment," which it did not define. Defendant retired from the New Brunswick Police Department the next day.

Defendant moved to dismiss the TRO on August 20, 2020. On September 30, 2020, plaintiff filed an amended complaint alleging two acts of contempt of the original TRO. Specifically, plaintiff claimed that defendant appeared at her place of employment on August 14, 2020 and September 29, 2020.

On December 1, 2020 the parties and their respective counsel appeared before the court for the FRO hearing. Before considering testimony, the court granted defendant's motion to dismiss plaintiff's complaint insofar as it pertained to the predicate acts of stalking and harassment. The court reasoned that plaintiff's complaint and testimony before the hearing officer "clearly indicate[ed] that the basis for the predicate act [was] an email that[] [was] forwarded to another individual, who then forward[ed] it to the plaintiff, and there's nothing . . . that connects the defendant to that" and that "there's nothing that would indicate a predicate act of harassment or stalking is there." It also rejected plaintiff's argument that the parties' history can be used to establish a predicate act. The court declined, however, to dismiss plaintiff's allegations of contempt of the initial TRO contained in her amended complaint.

Before the presentation of evidence, defendant's counsel stated he was not prepared to proceed because he was unsure whether all his witnesses were available and suggested that the hearing begin that day, but continue on another date. The court denied the request and explained that because it was available that day, it intended to proceed.

At the hearing, plaintiff called C.F., a colleague who worked at 25 Kirkpatrick Street and who knew both plaintiff and defendant. C.F. testified that in March 2020, plaintiff was reassigned to "the Building Department" on the second floor, and that while plaintiff was working there, defendant came into the office and handed her documents, causing her to be "thrown off guard." She also testified that on September 29, 2020, she observed defendant and the Director of Police, Anthony Caputo, walking down to the first floor of 25 Kirkpatrick Street in a stairwell, which was accessible to all employees of the building. She told plaintiff that defendant was in the building, causing plaintiff to "completely br[eak] down" and begin "shaking" and "hyperventilating."

Plaintiff also testified. She stated that on August 14, 2020, while she was working, "an officer" made her aware that defendant was in the building, which made her "extremely nervous," as she "didn't know whether he still had access

to the building at his own convenience" and "didn't know what to do or how to do it."

Plaintiff recounted that on September 29, 2020, both C.F. and a court officer alerted her that defendant was in the building. The news made her break down, because she "felt like [she] was trapped, that [she] would never be free," and that "even though there was a temporary restraining order, . . . it still didn't stop him from doing what he wanted at any point in time, which he showed over and over again throughout the history of the relationship."

She was concerned because she "was in the same stairwell . . . probably [fifteen] minutes prior" to defendant's appearance and she "could have ran into [defendant] at any point." She stated she was "scared to go to the New Brunswick Police Department" because she thought they would not "take her side." She also stated that no one from the Police Department alerted her that defendant was in the building, which "frightened [her] even more" because she had a "constant thought . . . lingering in [her] mind" wondering where defendant was and what he was going to do.

Plaintiff also testified regarding defendant's history of domestic violence. Plaintiff described that one night in January 2020, over the course of approximately two hours, defendant texted her saying that he was outside her

6

house and asking her to let him in, even though she never told him her address. She said the incident made her "a nervous wreck," and that she hid in her room, keeping the lights off and staying away from the windows so defendant would not see her.

Plaintiff detailed incidents from 2015 through 2019 described in her complaint, including when defendant sent an officer to her house and called her forty-two times and texted her fourteen times in a single night in 2015. She also stated defendant grabbed her in her office and refused to let go in 2016 or 2017. She further described that defendant transmitted unwanted texts, pictures, and video messages, including a picture of his genitals, drove by her house and walked by her office despite having no official business with her, eavesdropped and expressed disapproval when plaintiff talked to other men, and expressed anger "to the point where [defendant] wanted to ram his car into the car in front of him" after plaintiff avoided him.

Plaintiff also explained how defendant's behavior impacted her. She described her "mental trauma" including "not knowing what's going to happen, where he is and at what time," worrying that she might wake up with him standing over her, and feeling unable to call the police "because they were under him." She believed a final restraining order was necessary because "defendant

7

has shown . . . over and over again that he doesn't know what no means, . . . that he wasn't going to go away, . . . [and] that there's an above the law mentality" and referenced that he continued to show up to her workplace.

Plaintiff clarified that she worked on the first floor of 25 Kirkpatrick Street in the Prosecutor's Office since she was hired in 2015, "with the exception of a temporary reassignment due to COVID[-19] in the Construction Department," on the second floor, which began in March 2020, but indicated that she was "back at the [p]rosecutor's [o]ffice now." She stated that her job duties and responsibilities did not limit her to the first floor, however, and explained that she would "routinely go into the Police Department" in the "normal course of [her] job."

On cross-examination, plaintiff acknowledged that the last time she saw defendant was in March 2020 and that defendant was not physically violent at that time. She also said that she did not see defendant on August 14, 2020 or September 29, 2020.

Defendant's counsel questioned plaintiff regarding the timing of her complaint and the outcomes of the Middlesex County Prosecutor's Office and New Brunswick Police Department investigations. On redirect examination, plaintiff explained that she waited to file for a restraining order because the

investigations were "in motion" and she was hopeful that they would result in "some type of protection." She stated, however, that at the end of the investigation defendant was simply "told . . . to retire," causing plaintiff to worry about "him being out with all this time on his hands, and him . . . being able to do what he pleased, as he'd been doing," which motivated her to seek a restraining order.

Sergeant Thierry Lemmerling of the New Brunswick Police Department testified on behalf of defendant. He stated that on August 14, 2020 he received a call from defendant requesting an escort through 25 Kirkpatrick Street so that he could "turn in his equipment." Sergeant Lemmerling then had another officer, Captain Christopher Goldeski, meet defendant in the basement and escort him to Sergeant Lemmerling's office on the second floor, which was not accessible to civilians. He described that the "subbasement" was used to park police vehicles, and that civilians do not have access to that area. He also described that an elevator was accessible from the subbasement, which provided access to the first and second floors and was "for Police Department employees only."

On cross-examination, Sergeant Lemmerling stated that, although employees of 25 Kirkpatrick Street are "not supposed to" enter the "restricted"

elevator he discussed, they could actually access it. He also stated that it would have been possible for defendant to turn in his equipment without entering 25 Kirkpatrick Street.

Defendant's next witness was New Brunswick Police Director Anthony Caputo. He stated that on September 29, 2020 he saw defendant, accompanied by Detective Gallardo, on the second floor of 25 Kirkpatrick Street in police headquarters. From there, he walked with defendant to City Hall, and saw C.F. in a stairwell along the way. He also described that the elevator that provided access to the police parking deck was secured, requiring a "swipe card," and that civilians only used that elevator if escorted by an officer.

On cross-examination, Police Director Caputo stated that the purpose of defendant's visit on September 29 was to meet with the Business Administrator, whose office was on Bayard Street. Further, he said that defendant was not at 25 Kirkpatrick Street to see him, and that their meeting was a "social visit." Finally, he stated that the stairwell in which he saw C.F. was accessible to all employees of 25 Kirkpatrick Street.

Before concluding the hearing for the day, defense counsel stated that he had two witnesses that were unavailable, as he was under the impression the trial would not start that day, and requested an adjournment. After a brief discussion,

the court ultimately permitted defendant to continue the presentation of his evidence on December 4, 2020.

At the continuation of the hearing on December 4, 2020, defendant's counsel first called New Brunswick Police Captain of Administration Christopher Goldeski, who testified that on August 14, 2020, he met defendant, who was waiting with Detective Gallardo in the basement parking deck. He described that he accompanied defendant up the elevator, to his office on the second floor, where defendant handed in his equipment. Afterwards, he accompanied defendant back down the elevator, to the parking deck, and defendant departed. He stated that he was with defendant the entire time he was at the Police Department, spanning approximately twenty-five minutes, and that defendant did not go anywhere other than the second floor. Notably, on cross-examination, Captain Goldeski also conceded that it was not necessary for defendant to enter 25 Kirkpatrick Street to return his equipment.

Defendant next called Lieutenant James Hoover of the New Brunswick Police Department. Lieutenant Hoover stated that he met with plaintiff on August 18, 2020, who inquired about whether defendant's visit to 25 Kirkpatrick Street constituted a violation of her TRO. In response, Lieutenant Hoover contacted Presiding Municipal Court Judge Heitmann, who purportedly advised

11

that Lieutenant Hoover should prepare a report and instruct plaintiff that she could file a "citizen's complaint." Lieutenant Hoover then relayed that information to plaintiff, although she did not file a written complaint with him.

Finally, defendant called Officer Robert Rask of the North Brunswick Police Department. He testified that he met with plaintiff and C.F. on September 29, 2020 when plaintiff contacted him to report an alleged violation of her TRO. In response, he contacted New Brunswick to determine why defendant was in the building that day, and then contacted an assistant prosecutor, who allegedly advised that "it didn't appear to be a violation."

On cross-examination, he stated that he was advised defendant was at 25 Kirkpatrick Street because he was "in route to the Administration Building." Defense counsel made no reference to any unavailable witnesses on the record on December 4, 2020.

After hearing closing arguments, the court granted plaintiff's application for a final restraining order, concluding that defendant violated the amended TRO by appearing at plaintiff's workplace on September 29, 2020, but not based on his earlier appearance on August 14, 2020. The court first found that both plaintiff and C.F. were credible witnesses. As to plaintiff, the court further

commented that "[s]he was visibly shaking at points during her testimony" and "it was clear . . . that the plaintiff is in fact afraid of defendant."

The court then explained that plaintiff worked on the first floor of 25 Kirkpatrick Street, and that the two incidents in question involved defendant visiting the Police Department on the second floor. It then stated that "the question then becomes really, is a place of employment the entire facility, all of 25 Kirkpatrick Street, or is it just the Municipal Court." It further explained:

> plaintiff's testimony is that she [was working on the first floor], that in the end of March or beginning of April she was then transferred up to the Construction Office, which is on the second floor of 25 Kirkpatrick Street[,] [a]nd didn't return to the [first floor] until December 1st of 2020. So both in August and September she's on the second floor. The Police Department is on the second floor.
>
> And so the defendant is arguing that he didn't go to her place of employment doesn't hold as much water as it would if in fact she was always [working] on the first floor.

In concluding defendant did not violate the TRO on August 14, the court explained that "credible testimony" showed that defendant was escorted to the second floor, returned his equipment, and was escorted out. It reasoned that there was no violation because defendant had "a reason to be there" and "was escorted by police."

The court also determined, however, that defendant had violated the TRO in his subsequent appearance on September 29, 2020. It explained that defendant "[came] to the building on September 29th and [went] to the second floor, and [did] not have any justification or reason to be there." It concluded "there's a violation of the order by appearing on the second floor, which is the same floor that the Construction Office is located at[,] [w]hich is where plaintiff was located."

The court then applied the two-part test detailed in Silver v. Silver, 387 N.J. Super. 112, 125-26 (App. Div. 2006)[3] in deciding to issue the FRO. It determined that the violation of the TRO satisfied the first prong and found defendant's past history of domestic violence with plaintiff provided support for its finding that plaintiff satisfied the second prong. In making that determination the court recounted several incidents, including defendant showing up at plaintiff's house in January 2020, defendant sending plaintiff a photo of his genitals, defendant "wrapping his arms around her" in her workplace, and defendant indicating that "he doesn't want [plaintiff] talking to other people."

_____

[3] "First, the judge must determine whether the plaintiff has proven, by a preponderance of the credible evidence, that one or more of the predicate acts set forth in N.J.S.A. 2C:25-19a has occurred." Silver, 387 N.J. Super. at 125. "The second inquiry . . . is whether the court should enter a restraining order that provides protection for the victim." Id. at 126.

Defendant thereafter filed a timely motion for reconsideration and a request to reopen the hearing. In support, defendant provided two affidavits. The first, of Detective Danilo Gallardo of the New Brunswick Police Department, described that he escorted defendant both on August 14, 2020 and September 29, 2020 from the police parking deck to the Police Department on the second floor. Detective Gallardo also stated that he was not available to testify on December 1 or 4, 2020 because he was afflicted with COVID-19.

The second affidavit, of Deputy Director of Police J.T. Miller, described that he instructed defendant to "check in" with the Internal Affairs Department any time he was in the area of 25 Kirkpatrick Street, including City Hall, so that he could be provided a police escort. It stated further that defendant complied with that procedure on September 29, 2020, when he had reason to appear at City Hall.

The court heard oral arguments on the motion. Defendant argued the court erred in finding plaintiff was working on the second floor of 25 Kirkpatrick Street in August and September of 2020. In support, defendant asserted that both Captain Goldeski and Lieutenant Hoover indicated plaintiff was working on the first floor in the Municipal Court at the time in question and that the

15

police reports of Officer Rask and Lieutenant Hoover, which were introduced into evidence, stated plaintiff worked on the first floor.

Second, defendant argued that defense counsel's failure to produce Detective Gallardo and Deputy Director Miller was excusable because: 1) the partner who was supposed to handle the case was unavailable due to COVID-19; 2) the attorney who stepped in was unaware that the hearing would take place; and 3) Detective Gallardo was unavailable due to COVID-19.

Plaintiff opposed defendant's application and argued that defendant "failed to present any new facts or information that would warrant a motion for reconsideration." She explained that neither affidavit disputed Police Director Caputo's testimony that defendant "had no official reason to be at 25 Kirkpatrick Street" on September 29, 2020, and that he was there "for social purposes only."

Second, plaintiff contended the court did not err in finding that defendant was present in her workplace. She asserted: 1) plaintiff's place of employment was the entirety of 25 Kirkpatrick Street; 2) plaintiff and C.F. testified that plaintiff worked on both the first and second floors; 3) plaintiff testified that she routinely went to the Police Department "to fulfill her work duties;" and 4) defendant was present in a common stairwell on September 29, which plaintiff regularly used and had used approximately "fifteen minutes prior to defendant's

16

arrival." Finally, plaintiff argued that defendant was not denied due process as he had "over four months to prepare his case" from the time the TRO was filed, and the court continued the December 1, 2020 proceeding to allow defendant to submit further testimony.

The court denied defendant's motion and explained that "there was [no] error [in] any application of the law or error in [its] findings of fact." It explained that "on September 29th 2020 there was absolutely no reason whatsoever for defendant to be at that location" and "[plaintiff's] testimony was that she went back to the Municipal Court after that date." It also stated "the restraining order indicated that he was prohibited from her home and place of employment. The place of employment is located at 25 Kirkpatrick Street in New Brunswick."

This appeal followed, in which defendant claims the court: erred because it made and relied on an erroneous factual finding, specifically that plaintiff worked on the second floor until December 1, 2020; improperly determined that he purposefully or knowingly violated the TRO; incorrectly denied his motion for reconsideration and to re-open the hearing; and mistakenly found that the second Silver prong was satisfied. Plaintiff cross-appeals, arguing that the court erred in dismissing her original complaint which alleged predicate acts of

stalking and harassing, and in determining that defendant did not violate the TRO on August 14, 2020. We reject defendant's arguments and conclude the court's decision to issue a FRO was supported by substantial credible evidence in the record and affirm the orders on appeal, albeit on slightly different grounds. In light of our decision, we need not, and do not, address the contentions contained in plaintiff's cross-appeal.

II.

In defendant's first two points, he argues that the court's factual findings did not adequately support its conclusion that defendant acted in contempt of the TRO. Specifically, he claims that the court erroneously found that plaintiff worked on the second floor of 25 Kirkpatrick Street until December 1, 2020, and that it relied on that finding in determining defendant committed an act of contempt. He asserts that plaintiff provided no testimony regarding when her temporary assignment to the Construction Department ended, and that the testimony of Captain Goldski and Lieutenant Hoover, and Lieutenant Hoover's August 18, 2020 police report included that plaintiff worked only on the first floor on the dates defendant appeared at 25 Kirkpatrick Street.

Second, defendant argues that the court did not analyze whether he purposefully or knowingly violated the TRO. He asserts "the painstaking

18

procedures taken by [him] to avoid contact and continually have a police escort in the building demonstrate a lack of purpose, intent[,] or knowledge of violating a TRO," and that "there was no evidence showing that [defendant] ever knew that [plaintiff] was working on the second floor of the building for any period of time."

Our task in reviewing the court's decision "is not to reweigh the evidence but to determine if sufficient evidence exists" to support the decision. Roe v. Roe, 253 N.J. Super. 418, 431 (App. Div. 1992). In that regard, our appellate function is a limited one and we do not disturb the factual findings and legal conclusions of the court "unless they are so wholly insupportable as to result in a denial of justice." Rova Farms Resort, Inc. v. Investors Ins. Co., 65 N.J. 474, 483-84 (1974). This deferential standard "is especially appropriate when the evidence is largely testimonial and involves questions of credibility." In re Return of Weapons to J.W.D., 149 N.J. 108, 117 (1997).

Moreover, a greater degree of deference is to be accorded to the Family Part as it possesses "special jurisdiction and expertise," and we "accord deference to family court factfinding." Cesare v. Cesare, 154 N.J. 394, 413 (1998); see Brennan v. Orban, 145 N.J. 282, 304 (1996) (recognizing that the Legislature "reposed grave responsibilities on Family Part judges to ensure the

safety and well-being of women and children in our society"). To the extent the trial court's decision implicates questions of law, we independently evaluate those legal rulings de novo. See Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995).

"Domestic violence" as defined by the PDVA includes "[c]ontempt of a domestic violence order pursuant to" N.J.S.A 2C:29-9(b). N.J.S.A. 2C:25-19(a)(17). A person is guilty of contempt if that individual, "purposely or knowingly violates any provision in an order," entered under the PDVA. N.J.S.A. 2C:29-9(b)(1).

"A person acts purposely with respect to the nature of his conduct or a result thereof if it is his conscious object to engage in conduct of that nature or to cause such a result." N.J.S.A. 2C:2-2(b)(1). "A person acts knowingly with respect to the nature of his conduct or the attendant circumstances if he is aware that his conduct is of that nature, or that such circumstances exist, or he is aware of a high probability of their existence." N.J.S.A. 2C:2-2(b)(2).

It is not necessary that a defendant "personally acknowledge[s] the legal implications of his conduct" to be in contempt of a restraining order. State v. S.K., 423 N.J. Super. 540, 547 (App. Div. 2012). Instead "the evidence must allow at least a reasonable inference that a defendant charged with violating a

20

restraining order knew his conduct would bring about a prohibited result." Ibid. Because direct proof of intent is often absent, "purpose may and often must be inferred from what is said and done and the surrounding circumstances." State v. Castagna, 387 N.J. Super. 598, 606 (App. Div. 2006).

In response to defendant's first point, we are satisfied the record supports the court's factual finding that defendant acted in contempt of the TRO. The TRO specifically stated that defendant was barred from plaintiff's place of employment. At trial, plaintiff and C.F. testified that plaintiff worked on the first, and temporarily on the second floor of 25 Kirkpatrick Street, and further that plaintiff would "routinely go into the Police Department," which was partially on the second floor, in the "normal course of [her] job." That evidence fully supports the finding that plaintiff's place of employment was not limited to the confines of the Prosecutor's Office or the first floor of 25 Kirkpatrick Street. Further, and significantly, C.F. testified that on September 29 she observed defendant in a stairwell walking down to the first floor, establishing that defendant was present on both the first and second floors on that date.

In addition, in our view, it does not appear that the fundament of the court's analysis was based on when plaintiff's temporary assignment in the Construction Department on the second floor ended. Indeed, at the conclusion

21

of the trial, the court reasoned that "the question then becomes really, is a place of employment the entire facility, all of 25 Kirkpatrick Street, or is it just the Municipal Court," and in rejecting defendant's reconsideration motion it stated, "[t]he place of employment is located at 25 Kirkpatrick Street in New Brunswick." In any event, because we find the court's conclusion that defendant violated the TRO was supported by credible evidence, defendant's contentions challenging the court's rationale provide no basis for vacating the FRO or remanding for further proceedings. Roe, 253 N.J. Super. at 431; see also Price v. Hudson Heights Dev. LLC, 417 N.J. Super. 462, 463 (App. Div. 2011) (explaining that "appeals are taken from judgments and not from opinions").

The record also fully supports the court's conclusion that defendant purposefully or knowingly violated the TRO. First, defendant does not claim that he was unaware of the TRO's prohibitions or that plaintiff was employed at 25 Kirkpatrick Street. Second, because defendant knew that plaintiff worked at 25 Kirkpatrick Street, the court was justified in inferring that defendant either knew, or was "aware of a high probability," that his appearance at 25 Kirkpatrick Street would be considered an appearance at plaintiff's "place of employment," and therefore, a violation of the TRO. N.J.S.A. 2C:2-2(b)(2). That is especially true considering that defendant was present on both the first and second floors

22

of the building on September 29, 2020, and he had occasion previously to see plaintiff on the second floor, as established by C.F.'s testimony. Third, the court's explanation that defendant "[came] to the building on September 29th . . . [and did] not have any justification or reason to be there," adequately addressed defendant's state of mind.

We are unpersuaded by defendant's arguments to the contrary. First, because defendant appeared on both the first and second floors of 25 Kirkpatrick Street on September 29, 2020, whether he knew of defendant's temporary assignment to the second floor was not necessary to find that defendant knowingly violated the restraining order. In any event, C.F.'s testimony established that defendant knew plaintiff worked on the second floor, as she recounted an incident when defendant handed plaintiff documents while she was working in the Construction Department.

Second, we reject defendant's argument that the FRO should have been vacated because the record failed to support the court's findings as to when plaintiff's temporary assignment in the Construction Department ended. As noted, we are satisfied that there is sufficient credible evidence as found by the court to support its conclusion that defendant violated the TRO on September 29, 2020 regardless of plaintiff's exact work location on that day.

23

Third, we are unpersuaded that the presence of a police escort excused or minimized defendant's conduct, especially under the facts presented here, where plaintiff's fear of defendant was premised in part by his status as a police officer and what could reasonably have been regarded as apparent support by the New Brunswick Police Department. See also State v. Hoffman, 149 N.J. 564, 586 (1997) ("An abuser who spontaneously appears . . . without any legitimate purpose enhances the victim's apprehension.").

Further, if defendant believed circumstances required clarification or an exception to the terms of the temporary restraining order, the appropriate course, and one employed routinely, would have been for defendant to file a formal application in the Family Part to modify the TRO before engaging in conduct that could violate its terms rather than solicit assistance from his former colleagues to accompany him at plaintiff's current, and his prior, place of employment. See Supreme Court of N.J. & Attorney Gen. of N.J., State of New Jersey Domestic Violence Procedures Manual, § 4.12 (2008) (explaining the procedure to request a modification of an ex parte TRO).

In sum, because the court's finding that defendant committed an act of contempt was supported by the record, we have no basis to overturn that conclusion. Rova Farms Resort, 65 N.J. at 483-84; Roe, 253 N.J. Super. at 431.

III.

Defendant argues next that the court erred in denying his motion for reconsideration and to re-open the hearing because the testimony of "an unavailable, but critical witness, would have led to a different result." Specifically, he asserts that Detective Gallardo was unavailable and his testimony would go "directly to the predicate act of [c]ontempt arising on September 29, 2020, . . . would establish the reason for [defendant's] presence at police headquarters . . . on September 29, 2020," and would include a "description of the efforts made by [defendant] . . . to avoid a violation of the TRO."

He asserts further that Detective Gallardo's testimony would have been corroborated by the testimony of Deputy Director Miller, whose affidavit included that he determined defendant "should contact the Internal Affairs Department any time that he was in the area." Defendant claims the inability to present this testimony was a due process violation. Finally, he asserts the court's refusal to grant an adjournment on December 1, 2020 "underpins and compounds the [d]ue [p]rocess depravation." We are unpersuaded by these arguments.

A-1425-20

We review the denial of a motion for reconsideration for abuse of discretion. Triffin v. Johnston, 359 N.J. Super. 543, 550 (App. Div. 2003). "Reconsideration itself is 'a matter within the sound discretion of the [c]ourt, to be exercised in the interest of justice[.]'" Palombi v. Palombi, 414 N.J. Super. 274, 288 (App. Div. 2010) (quoting D'Atria v. D'Atria, 242 N.J. Super. 392, 401 (Ch. Div. 1990)). Reconsideration "should be utilized only for those cases that fall into that narrow corridor in which either 1) the [c]ourt has expressed its decision based upon a palpably incorrect or irrational basis, or 2) it is obvious that the [c]ourt either did not consider, or failed to appreciate the significance of probative, competent evidence." Ibid. "[T]he magnitude of the error cited must be a game-changer for reconsideration to be appropriate." Id. at 289. We will not disturb a court's denial of a motion for reconsideration absent a clear abuse of discretion. Pitney Bowes Bank, Inc. v. ABC Caging Fulfillment, 440 N.J. Super. 378, 382 (App. Div. 2015).

Reconsideration is properly denied when the application is based on unraised facts known to the party seeking reconsideration prior to the entry of the challenged order and "cannot be used to expand the record." Capital Fin. Co. of Del. Valley, Inc. v. Asterbadi, 398 N.J. Super. 299, 310 (App. Div. 2008). "A motion for reconsideration is designed to seek review of an order based on

A-1425-20

the evidence before the court on the initial motion, <u>R.</u> 1:7-4, not to serve as a vehicle to introduce new evidence in order to cure an inadequacy in the motion record." <u>Ibid.</u>

A request for adjournment is "addressed to the discretion of the court, and its denial will not lead to reversal" except for an abuse of discretion. <u>State v. Hayes</u>, 205 N.J. 522, 537 (2011). "Ordinarily, we do not interfere with a motion judge's denial of a request for an adjournment unless an injustice has been done." <u>Rocco v. N.J. Transit Rail Operations</u>, 330 N.J. Super. 320, 343 (App. Div. 2000).

"A litigant in civil proceedings is entitled to a fair hearing, imbued with the protections of due process." <u>In re Adoption of Child ex. rel. M.E.B.</u>, 444 N.J. Super. 83, 88 (App. Div. 2016). Both the Fourteenth Amendment to the United States Constitution and Article I, paragraph 1, of the New Jersey Constitution protect the due process rights of defendants in actions brought under the PDVA. <u>H.E.S. v. J.C.S.</u>, 175 N.J. 309, 321 (2003). "At a minimum, due process requires that a party in a judicial hearing receive 'notice defining the issues and an adequate opportunity to prepare and respond.'" <u>Id.</u> at 321-22 (quoting <u>McKeown-Brand v. Trump Castle Hotel & Casino</u>, 132 N.J. 546, 559 (1993)). "[I]n all cases the trial court must ensure that [the] defendant [in an

FRO proceeding under the PDVA] is afforded an adequate opportunity to be apprised of [the] allegations [in the complaint] and to prepare." J.D., 207 N.J. at 480.

Here, the court did not abuse its discretion by denying defendant's motion for reconsideration and to re-open the hearing. First, defendant only raised the issue of unavailable witnesses at the December 1, 2020 hearing. In response, the court effectively granted an adjournment to allow him to resolve his witness issues. At no point on December 4, 2020 did defendant raise the issue of unavailable witnesses or request an adjournment.

Second, Deputy Director Miller did not contend that he was unavailable to testify, and it appears that consideration of his testimony after the fact would have improperly allowed defendant to "expand the record." Capital Fin. Co. of Del. Valley, Inc., 398 N.J. Super. at 310.

Third, Detective Gallardo's affidavit only includes information about him escorting defendant to and from the police parking deck and the Police Department on the second floor, which is duplicative of other testimony that was fully considered by the court and certainly does not amount to a "game-changer." Palombi, 414 N.J. Super. at 289.

Finally, defendant makes no assertion that he was denied "adequate opportunity to be apprised of [the] allegations [in the complaint] and to prepare," J.D., 207 N.J. at 480, and rightfully so, as defendant had a full four months between plaintiff's filing the initial TRO and the first hearing on December 1, 2020.[4]  As such, he suffered no deprivation of due process.  Ibid.; H.E.S., 175 N.J. at 321.  In short, defendant's arguments do not establish the court abused its discretion in declining defendant's motion for reconsideration and to re-open the hearing.  Triffin, 359 N.J. Super. at 550.

## IV.

Finally, defendant argues that the court erred in finding plaintiff satisfied the second Silver prong.  Specifically, he claims plaintiff sought the TRO only because of dissatisfaction with the outcome of the Middlesex County Prosecutor's Office and New Brunswick Police Department investigations, rather than fear of defendant.  He further asserts that defendant had no contact with plaintiff since March 2020 and that the court improperly focused on incidents dating back as much as five years.  We disagree.

---

[4] We note that typically hearings involving domestic violence restraining orders are conducted expeditiously.

As noted, once plaintiff has satisfied the first Silver prong by proving a predicate act, the second prong requires the court to determine "whether [it] should enter a restraining order that provides protection for the victim." Silver, 387 N.J. Super. at 125-26. "Although [the] second determination . . . is most often perfunctory and self-evident, the guiding standard is whether a restraining order is necessary, upon an evaluation of the factors set forth in N.J.S.A. 2C:25-29a(1) to -29a(6), to protect the victim from an immediate danger or to prevent further abuse." Id. at 127. The factors enumerated in N.J.S.A. 2C:25-29(a) include "[t]he previous history of domestic violence between the plaintiff and defendant, including threats, harassment and physical abuse, . . . [t]he existence of immediate danger to person or property," and "[t]he best interests of the victim."

Here, in determining that plaintiff satisfied the second Silver prong, the court first reiterated that it found plaintiff to be a credible witness, that she was visibly upset during her testimony, and that she was fearful of defendant. The court also recounted several incidents in the parties' history that supported plaintiff's fears, including defendant texting plaintiff that he was outside her house, defendant sending plaintiff pictures of his genitals, defendant grabbing plaintiff in her workplace and refusing to let go, and defendant indicating he

does not want plaintiff talking to other people. These considerations were established by credible evidence and speak directly to the defendant's history of domestic violence and are informative as to plaintiff's current fear of defendant and the need for a restraining order. N.J.S.A. 2C:25-29(a).

Defendant's arguments to the contrary are wholly unpersuasive. First, the fact that defendant's abusive behavior spans five years supports, rather than contradicts, the court's finding that a FRO was necessary for plaintiff's protection. Second, defendant's claim that he had no contact with plaintiff since March 2020 is undermined by his violation of the TRO in September 2020, regardless of whether he directly encountered her that day at her workplace.

Finally, the second Silver prong does not require that plaintiff be motivated by fear of the defendant in order to obtain a FRO but rather that a FRO is necessary to protect her. In any event, the record supports that plaintiff was in fact motivated by fear after the Middlesex County Prosecutor's Office and New Brunswick Police Department investigations provided her without the necessary protection she sought. Indeed, she testified that she waited to file the TRO because she "was hopeful that the investigation would come back favorable so that [she] would have some type of protection." When plaintiff found out that "at the end they just told him to retire" she thought "over and over

again . . . about him being out with all this time on his hands, and him . . . being able to do what he pleased, as he'd been doing."

To the extent we have not addressed any specific contentions in the previous sections, it is because we have concluded they fare of insufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E). As noted, in light of our decision, we do not reach the arguments raised by plaintiff in her cross-appeal.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1425-20